[L. A. No. 13644. In Bank.—October 24, 1932.]

WUTCHUMNA WATER COMPANY (a Corporation), Appellant, v. W. R. BAILEY, Respondent.

Walter M. Gleason, Humphrey, Searls, Doyle & MacMillan and Morgan J. Doyle for Appellant.

Farnsworth, Burke & Maddox, H. Scott Jacobs and Adolph Feierbach for Respondent.

PRESTON, J.—This action is an offshoot of two other actions now pending in the Tulare County Superior Court, one No. 19876, styled *Lakeside Ditch Co. et al.* v. *Wutchumna Water Company et al.*, and the other No. 19897, styled *Jennings Ditch Water Company et al.* v. *Wutchumna Water Company*. In these actions the present defendant and respondent appears as the leading attorney for all of the plaintiffs—some sixteen or seventeen concerns owning water rights on the Kaweah River and its branches, rights resting largely upon claims of appropriation and prescription. This plaintiff is a mutual water corporation owning two appropriate rights in the said stream, one on the main stream itself above McKay Point and the other on a branch called the St. Johns River, and is engaged in the distribution of its water so owned to its stockholders for beneficial uses on agricultural lands in that region, situate in Tulare and

Kings Counties, known as the Kaweah delta. Plaintiffs in the two above-mentioned actions are likewise engaged in the distribution of water for irrigation and other useful purposes in the same general area. Conflicting claims to the waters of said stream, affecting all the parties to said actions, either have arisen or have been threatened at various times over a great number of years and in many aspects the issues still obtain. This water use has produced over the years a vast amount of litigation, not a small part of which has reached the files of this court.

Practically the sole assets of this plaintiff are its two water rights and the diversion works and distribution system necessary for their utilization. The larger right is known as the Upper Diversion and is taken from the main Kaweah River near the foothills of the Sierra Nevada mountains some fifteen miles east of Visalia and is conveyed some four miles to a storage reservoir known as Bravo Lake. This right had its inception as early as 1856. The smaller, or lower, right is on the St. Johns River and is taken out at a point commonly known as the Barton cut, which is some twelve miles down stream from McKay Point. This ditch connects with the main ditch about one mile below the point of diversion. The relations between all these water users are the more complex when it is realized that the several water rights claimed by them do not exist in single units of the same grade but some are primary and some are secondary in their makeup and some are split so that certain waters are received primarily and others are received after prior claimants have been supplied in whole or in part. The interrelation and interdependence of these rights make the subject of their relative adjustment a delicate question. Indeed, all the rights of this plaintiff itself are not primary but are subject to certain priorities and contingencies, particularly as to the smaller or Barton cut right. There have been many agreements between certain of these users attempting to adjust their respective claims as between themselves, but in the main it may be said that as between this plaintiff and the other users above mentioned no definite adjudication or agreement has ever been made. Apparently it is the object of the said two suits to make an adjudication of this plaintiff's preferential and subordinate rights in the water of said river and its branches.

The question we are here to solve, however, is not the extent or priority of these rights but it is whether or not W. R. Bailey, defendant here, and the attorney for the plaintiffs in said two actions, may lawfully and justly represent them in view of his former stewardship as attorney for this plaintiff. To bring this question to the foreground, plaintiff instituted this action against said attorney, praying that he be restrained from so appearing as attorney for plaintiffs in said actions and also that he be permanently enjoined from directly or indirectly disclosing knowledge or information gained by him as such attorney concerning this subject matter. Issue was joined upon the complaint and a trial conducted. A voluminous record was there made which is now before us, followed by briefs of abnormal size, disclosing a great deal of regrettable bitter feeling between the parties; in fact, so much animosity appears that it is difficult to get an unbiased view of the issues of the case from a perusal of the briefs. The court below, after hearing the evidence, made findings thereon and gave judgment refusing to disqualify the defendant. Plaintiff thereupon appealed. As our conclusions are to be predicated upon undisputed facts in the case we see no reason for setting out at length the contents of the findings made by the court below. Hence, sufficient facts for a determination of this appeal will now be recited.

For many years prior to 1913 Mr. E. O. Larkins, attorney at law residing at Visalia, was the sole attorney for appellant respecting these water rights which, as already stated, were practically its sole asset. During the latter part of this period respondent Bailey was a clerk in the office of Mr. Larkins and there he first became familiar with the business of appellant. About this time also he became the son-in-law of Mr. Larkins. In 1913, upon his admission to the bar in this state, he became the partner of Mr. Larkins and remained with him, either as a partner or associate, until the year 1924, at which time the relation was terminated by Mr. Larkins' death. During all the period of respondent's incumbency at the bar and until some time in the year 1927 he was either individually or in connection with Mr. Larkins, the sole attorney for appellant or its *alter ego,* its receiver. His contract with the corporation was for an annual retainer with special compensation

for extra work. The retainer covered general advice, the drawing of papers, attendance upon meetings of the board of directors and of stockholders, when required, and even the drafting of the minutes of such meetings. Prior to the year 1913 several lawsuits in connection with these water rights were conducted on behalf of appellant by Mr. Larkins and in some of them the nature and extent of appellant's water rights were averred (*Wutchumna Water Co.* v. *Ragle,* 148 Cal. 759 [84 Pac. 162]; *Wutchumna Water Co.* v. *Pogue,* 151 Cal. 105 [90 Pac. 362]). At least one action, begun in the year 1904, relating to the Barton cut appropriation, was pending and undetermined in 1913 upon the induction of respondent as one of appellant's attorneys. Indeed, the action is still pending and it may be here further noted that it had as parties thereto some of the same parties as are now plaintiffs in action No. 19897 above mentioned. In other words, the early action concerned the exact subject matter that is now involved in the later cause, to wit: Priorities of appellant and said parties in the waters of the St. Johns River by reason of the diversion at Barton cut. The later complaint filed by respondent takes a position in conflict with that taken by E. O. Larkins in the old suit and to the detriment of appellant. These adverse claims of said parties as against appellant were on several occasions the subject of consideration by its board of directors during the time that respondent was acting as its attorney, and whether he recalls it or not, respondent doubtless knew of them at said time, and it was his duty to advise the board with respect thereto.

It should be here further noted, however, that the storm center of the conflict between appellant and these other water-users is not so much the extent of the smaller right as the extent and priority of the main or upper water right. It is appellant's contention that it owns a primary water right of ten per cent of the stream flowing at the head of the Wutchumna ditch up to 140 c. f. s. It is the claim of the other users that this right is ten per cent of the body of the stream up to 1,000 c. f. s. and 100 c. f. s. when the volume of the stream is between 1,000 and 2,000 c. f. s. and ten per cent extra when the flow of the stream is from 2,000 c. f. s. up to 2,400 c. f. s. In other words, appellant asserts its primary right to be 140 c. f. of water per

second when there are 1,400 feet flowing in the stream at the head of its diversion works, whereas the adverse contention is that this maximum amount may not be reached unless and until there are 2,400 c. f. s. flowing in the stream. The complaint in case No. 19876 sets up this issue and it is the gravamen of said complaint.

In fact, the main and specific cause of the animosity between appellant and respondent, as its attorney, arose over this issue, as we shall now show. For it appears that in 1921, in the cause entitled *Tulare Irrigation District* v. *Lindsay-Strathmore Irrigation District*, appellant was impleaded and required, under section 534 of the Code of Civil Procedure, to make a declaration of the extent of its water right. Respondent, as its attorney, set forth its right to be as now claimed by it and not as claimed by the above-mentioned adverse users. There is also proof that in the cause just mentioned evidence was received under the guidance of respondent which tended to substantiate the primary claim of appellant to be 140 c. f. s. of water when there are 1,400 c. f. s. of water flowing in the stream. Respondent, as attorney for appellant, also conducted two or more other causes for the protection of these water rights, one at least respecting the reservoir and another or more to prevent interference with this main ditch, which causes could not but have revealed to him the nature and extent of appellant's title, together with the ground upon which it rested and the defects, if any, that existed therein.

Finally, in 1926, when a vacancy occurred on the board of directors of appellant and a deadlock existed as a result thereof and pending the filling of the vacancy on the board respondent, as appellant's attorney, recommended that a friendly receiver be sought for the company. This was recommended so that adequate steps might be taken to "protect" and "defend" and "preserve" these identical water rights against adverse claimants, although these particular adverse claimants are not mentioned. The program for appointment of a receiver was carried out and a man named Switzer was appointed receiver, respondent becoming his attorney and acting as such during the year 1926 and until some time in the year 1927. During this period respondent, as such attorney, on behalf of the receiver prepared and filed a complaint in the Tulare County

Superior Court entitled *Switzer, as Receiver of Wutchumna Water Company*, v. *Foot Hill Ditch Co. et al.*, No. 17583, in which complaint it was attempted to allege a specific statement of the nature and extent of each of appellant's two said water rights and in that action the right of appellant as to the said upper diversion was defined to be not as contended for by it in the proceeding under section 534 of the Code of Civil Procedure but it was defined and set forth as now contended for by the adverse users on said stream, to wit: The parties plaintiff in said action No. 19876. No final adjudication, however, was made in said action. Later the reccivership was closed and upon the incoming of a final report prepared by respondent and upon payment to him of a substantial attorney's fee, his career as appellant's attorney was ended by his discharge. The basis of such discharge was that in minimizing and compromising appellant's water rights in said litigation, respondent had not acted with frankness and candor nor upon the advice nor with the consent of any of the officers or directors of appellant.

It is not necessary for us to express any views upon the question of whether respondent acted prudently and in good faith in the filing of said suit. But we prefer to think that he acted in good faith and there are grounds at least for the belief that some of appellant's responsible officers claimed its water rights to be no more than as alleged in the complaint filed by respondent for the said receiver. At any rate, from this incident arose all the bitterness which marks the instant litigation. Respondent, within a few months after his discharge, set about bringing the two actions first above described and raised on behalf of the adverse claimants on the stream the identical issues which lay at the foundation of his discharge by appellant. The situation suggests that respondent by these actions intends in part to justify the position taken by him as attorney for the said receiver. It may be here added also that we have not recited much of the evidence which tends clearly to show that respondent not only is to be presumed to have gained much confidential information and knowledge that will be useful to the plaintiffs in said actions as instituted and to that extent detrimental to the rights of appellant, but there is specific evidence of certain papers concerning

which he admits knowledge which, in our judgment, constitute confidential information that he may not lawfully use against his former client.

This brings us to a statement of some of the principles of law that must guide us in pronouncing a result in this case. We shall first state that in setting forth the principles here involved, the good faith of respondent in this matter is not the issue. We are here declaring the policy of the law in promoting the administration of justice. ██ The relation of attorney and client is one of highest confidence and as to professional information gained while this relation exists, the attorney's lips are forever sealed, and this is true notwithstanding his subsequent discharge by his client and notwithstanding the lack of any justification for such action.

"The obligation to represent the client with undivided fidelity does not end with the matter in which the lawyer may have been employed. Thenceforth the lawyer must refrain not only from divulging the client's secrets or confidences, but also from acting for others in any matters where such secrets or confidences or knowledge of the client's affairs acquired in the course of the earlier employment can be used to the former client's disadvantage." (Costigan on Cases on Legal Ethics, p. 376.)

Mr. Thornton on Attorneys at Law, volume I, section 176, pages 314, 315, sets forth the moral obligation, saying: "It may prove to be a very difficult matter to determine, as concrete questions arise, whether lawyers can or cannot safely act for a new client; whether in doing so they may not unintentionally, and perhaps unconsciously, put at his service confidential information obtained from the old client by reason of the professional relationship. Ordinarily the court will assume that counsel will decide that question for themselves in scrupulous conformity to their professional obligations. The path of unquestionable safety, however, would be found in abstention from participation, active or merely as advisers, in any business which may, even by unkind critics, be considered adverse to their clients' interests. For if they become actively engaged for an interest hostile to that of a former client, they will be likely to find their progress impeded by pitfalls or quagmires into which they may stumble, or by which they may be besmirched."

An early case on this subject is *In re Boone,* 83 Fed. 944, 952, a case arising in the Northern District of California and decided by former Circuit Judge Morrow. It is strikingly similar in principle to the case at bar. There the attorney had acted as such for nine years for a certain party in the protection of certain patent rights. After severing the relationship, the attorney sought employment by the opposite side in a case affecting one or more of these patents, a case, however, in which he had not appeared as counsel for his former client. Thereafter charges were filed against him for his disbarment. The court said: ''It is the general and well-settled rule that an attorney who has acted as such for one side cannot render services professionally in the same case to the other side, nor, in any event, whether it be in the same case or not, can he assume a position hostile to his client, and one inimical to the very interests he was engaged to protect; and it makes no difference, in this respect, whether the relation itself has been terminated, for the obligation of fidelity and loyalty still continues. . . . The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection. (Citing cases.) 'An attorney cannot use the knowledge acquired confidentially from his client in trafficking with his client's interests. (*Hatch* v. *Fogerty,* 40 How. Pr. (N. Y.) 492.) This general and well-settled rule is not found in any positive enactment. Indeed, none is necessary; it springs from the very nature and necessities of the relation of attorney and client, and finds its highest sanction in the confidential character of that relation. No rule in the ethics of the legal profession is better established nor more rigorously enforced than this one. The relation of attorney and client is one of mutual trust, confidence, and good-will. (*Arrington* v. *Sneed,* 18 Tex. 135.) The attorney must use all the care, skill, and diligence at his command on behalf of his client. The relation being,

in the highest degree, a confidential one, he is bound to the strictest secrecy and the most scrupulous good faith.· . . . This brief statement of the duties and obligations which an attorney owes to his client demonstrates of itself, if, indeed, any demonstration is necessary, how utterly inconsistent with the proper and faithful discharge of them, and, in fact, totally subversive of them, would be any rule permitting the attorney to occupy a position hostile to his client, or to use against him the knowledge he has confidentially acquired. The authorities· are all of one accord on this proposition, and disbarment has invariably been inflicted on the attorney who has violated, or attempted to violate, this rule of professional conduct. . . . ''

From the above cases the text-writers have condensed the rule into the following language: ''The fact that an attorney has once acted in a professional capacity for a person does not preclude him from thereafter accepting a retainer to act adversely to his former client in a matter which has no reference to his previous employment, nor is he precluded from acting for another in the same general matter where his employment is not adverse to his former client. The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection.'' (2 R. C. L., p. 974, sec. 52.) ''The rule does not mean, however, that an attorney having once been employed by a client shall never thereafter appear in any matter against him; it merely forbids his appearance or acting against him where he can use, to the detriment of such client, the information and confidences acquired during the existence of their relation as attorney and client.'' (6 C. J., p. 620.)

From these pronouncements it appears that an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any matter in which he formerly represented him nor may

he at any time use against his former client knowledge or information acquired by virtue of the previous relationship. ▮ We think from the record in this case it is too clear for controversy that to allow respondent to proceed as the attorney in the pending cases would be to offend the rule in both particulars; first, he will be appearing practically on the opposite side of a controversy in which he formerly represented the appellant for a great many years and, second, he cannot but use therein confidential knowledge and information gained by virtue of that relationship of attorney and client. We are not by this holding intending to reflect upon counsel but merely to declare these salutary rules of public policy. ▮ It is no defense to urge that respondent, during the period of his attorneyship, was also attorney for some of the present plaintiffs in the new action. The disqualification exists in that case to the same if not a greater degree.

The judgment of the court below is therefore reversed and the cause is remanded to that court, with directions to prepare findings upon the record as made and enter a judgment not inconsistent with the views set forth in this opinion.

Langdon, J., Curtis, J., Tyler, J., *pro tem.*, Waste, C. J., Shenk, J., and Seawell, J., concurred.