[No. A035953. First Dist., Div. Four. Aug. 12, 1988.]

DAVID WELCH CO., Plaintiff and Appellant, v.
ERSKINE & TULLEY et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II-E, F, G, and H.

**COUNSEL**

Eric W. Jorgensen, Thomas M. Peterson, G. Scott Emblidge and Brobeck, Phleger & Harrison for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, Duane C. Musfelt, Ledeen G. Barnett and H. Bennett Arnberger for Defendants and Appellants.

## Opinion

**CHANNELL, J.**—Following a court trial, defendants Erskine & Tulley (E&T) and Michael Carroll appeal from a judgment entered against them and in favor of David Welch Co. (Welch). The trial court held that E&T, a law corporation, and Attorney Carroll had breached their fiduciary duty towards Welch, their former client, and had received a benefit of $350,000, which defendants were deemed to hold in constructive trust for Welch. Defendants were ordered to disgorge that benefit to Welch. Welch cross-appeals from that portion of the judgment providing that its recovery shall be only from those defendants, and only in the amount of $350,000.

This controversy arises from the fact that after E&T and Welch terminated their attorney-client relationship in December 1980, E&T gradually acquired the collection business activities formerly performed by Welch in behalf of several employee benefit trust funds. The basic issue in the trial court was whether, in doing so, the law firm or any of its attorneys breached a fiduciary duty towards their former client.

### I. Facts

Welch is a licensed collection agency which, over several years, developed a highly profitable specialty in collecting delinquent employer contributions owed to 35 or more employee-benefit trust funds. From 1972 to 1980, E&T acted as counsel for Welch, with Attorney Carroll doing most of the work for them in the later years. Before undertaking the representation of Welch, neither E&T nor Carroll had experience in collection agency work for trust funds.

The evidence was in conflict as to how defendants acquired their knowledge for conducting this type of collection activity. Defendants presented evidence indicating that, from a legal standpoint, it was like any other collection work, and that no specialized knowledge or expertise was required. Welch presented evidence that the E&T attorneys were specially trained by the owner, David Welch, on these matters; they were entrusted with complete access to information about Welch's confidential and profitable business techniques; and they were introduced by Welch as its attorneys to the trustees of the various trust funds. All of the information so provided was intended by Welch to be confidential.

When collecting a debt, Welch had the trust fund assign legal title to it, with the trust fund retaining equitable title. If its own collection efforts proved unsuccessful, Welch had E&T file suit in Welch's name as assignee of the trust fund. Before turning a case over to its counsel, Welch would

carry out its own collection efforts, investigate the financial status of the delinquent employer, and prepare a case file which included all of the background documents, suggestions for handling the matter, and a draft complaint ready for filing in court.

Because collecting for trust funds was so profitable, David Welch organized his business in a manner designed to preserve the confidentiality of its procedures. He separated the trust fund activity from his other collection activities, used only his most trusted employees, physically located the activity on a separate floor of his office, and took other steps to minimize dissemination of information and to protect against someone within his firm from breaking away and starting a competitive business.[1]

In late 1979, the collection agency was sold, and Welch was taken over by Philip W. Coyle. In 1980, Welch stopped referring collection matters to E&T. The parties thereafter agreed to terminate their relationship, effective after December 31, 1980. At approximately the same time, notices were sent by Coyle to Welch's trust fund clients indicating that Welch soon would be increasing its fees for those clients for the first time since 1968.

In mid-1981, the Sheet Metal Workers Trust severed its relationship with Welch, and transferred its collection business to E&T. At the time, Welch viewed this as an isolated incident. During 1982 and early 1983, several more trust funds did likewise. The evidence indicates that E&T did not solicit these particular clients, but instead responded to inquiries from each trust fund requesting a proposal. On the other hand, there was no evidence that E&T disclosed to Welch, its former client, that it was submitting these proposals, nor that E&T sought to secure Welch's consent to take over these accounts. In each instance, Welch learned it had lost its account from someone other than E&T, usually in the form of a letter from the trust fund announcing as a fait accompli that their business was being transferred to E&T.

By the time Welch filed its complaint against E&T in February 1983, the law firm had obtained the collection accounts of at least 10 of Welch's former trust fund clients, with annual billings approximating $156,715.

---

[1] The trial court found that while acting as Welch's attorney, defendants gained their first exposure to the trust fund collection business; gained their first exposure to Welch's clients, including many trust fund administrators; gained access to Welch's fee schedules for trust fund clients; and generally obtained confidential information from Welch.

## II. Discussion

### A. *Breach of Fiduciary Duty*

Defendants' first set of contentions relates to whether substantial evidence supports the trial court's findings that they breached their fiduciary duty towards Welch. With respect to a cause of action alleging breach of a fiduciary duty, the existence of the duty is a question of law. "The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity —*uberrima fides.*"[2] (*Cox* v. *Delmas* (1893) 99 Cal. 104, 123 [33 P. 836]; *Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 383 [193 Cal.Rptr. 422].)

There is no dispute that a fiduciary duty did exist in this case. The issue is whether defendants breached that duty towards Welch, which is a question of fact. (*Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 276 [132 Cal.Rptr. 222].) As in other claims of lack of evidence, the question is " 'whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

 Defendants' initial contention concerning this issue is that the trial court erred in finding a breach of fiduciary duty based on alleged violations of rules 4-101 and 5-101 of the Rules of Professional Conduct (rules). Before trial, defendants had successfully moved for summary judgment as to the first cause of action, which had alleged that a violation of the rules, as a matter of law, provided a basis for civil liability. (See *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164] [violation of rules does not render attorneys liable in damages].) Nevertheless, these rules, together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which the attorney owes to his or her client. (*Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125, 1147 [217 Cal.Rptr. 89].)

 In their argument, defendants cite rules 4-101 and 5-101 and then proceed to argue why their conduct neither fits within one of those rules nor otherwise constitutes a breach of a fiduciary duty. Defendants repeatedly suggest that the trial court concluded that their "mere acceptance of legal work from plaintiff's former clients" constituted such a breach. But more than that is required to establish a breach, and more than that was proven.

---

[2] *Uberrima fides* means "[t]he most abundant good faith; absolute and perfect candor or openness and honesty; the absence of any concealment of deception, however slight." (Black's Law Dict. (Rev. 4th ed. 1968) p. 1690.)

For example, the trial court found that defendants "breached their ficuciary [*sic*] duty owed to plaintiff by accepting employment adverse to plaintiff without plaintiff's informed and written consent relating to a matter in reference to which defendants had obtained confidential information by reason of or in the course of their employment by plaintiff . . . ."

This finding was patterned after rule 4-101, a rule which on its face applies to former as well as present clients.[3] ▪ The primary purpose of that rule is to protect the confidential relationship which exists between attorney and client. (*Quaglino* v. *Quaglino* (1979) 88 Cal.App.3d 542, 549 [152 Cal.Rptr. 47].) It has been said that an attorney may not "at any time use against his former client knowledge or information acquired by virtue of the previous relationship. . . ." (*Wutchumna Water Co.* v. *Bailey* (1932) 216 Cal. 564, 573-574 [15 P.2d 505]; *Quaglino* v. *Quaglino, supra,* at p. 549.) The actual use or misuse of confidential information is not determinative; it is the possibility of the breach of confidence which controls. (*Woods* v. *Superior Court* (1983) 149 Cal.App.3d 931, 934 [197 Cal.Rptr. 185].) This duty to protect confidential information continues even after the formal relationship ends.

▪ Although neither party is able to cite a case involving a fact pattern analogous to this one, rule 4-101 seems to apply literally to this case. The typical case falling within the rule arises in the context of legal representation of a client whose interests are adverse to another client or former client of the attorney. (See, e.g., *Wutchumna Water Co.* v. *Bailey, supra,* 216 Cal. 564.) But "adverse" also connotes being "opposed to one's interest" or "unfavorable." The acquisition by an attorney of business clientele of a former client operates to the economic advantage of the attorney and unfavorably upon the former client. Concerning access to confidential information, David Welch testified as to his company's efforts to maintain the confidentiality of this portion of Welch's business, including its fees schedules, its methods of operation, and other information. Nevertheless, all of this information was shared with defendants. Finally, defendants accepted the new employment without first notifying or in any way seeking the informed consent of Welch before submitting its proposals to the various trust funds.

The trial court further found that "defendants breached their fiduciary duty owed to plaintiff by knowingly acquiring a pecuniary interest adverse to plaintiff without first obtaining plaintiff's informed written consent

---

[3] Rule 4-101 provides: "A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

. . . ."[4] This finding highlights what we consider to be a critical factor in finding a breach of duty in this case, namely, the fact that defendants, who previously had been privy to Welch's confidential information, in no way informed Welch that they were preparing proposals designed to undercut Welch's business relationships.

We agree with defendants that the various trust funds were free to send their business to any entity they chose, as absent a contract to that effect, they were under no continuing duty to continue business with Welch. Similarly, any law firm, *other than E&T,* was free to make proposals at the request of those trust funds in an effort to obtain their business, as E&T did in this case. But, due to the preexisting attorney-client relationship during which defendants were in a position to and did obtain confidential information about Welch's business, *these defendants* had a higher duty, which was to refrain from acquiring any pecuniary interest involving collection work for these trust funds unless they first notified and obtained the informed consent of Welch to submit their business proposals. As they did not do so, the trial court properly found that they had breached their fiduciary duty towards Welch.

B. *Need for Expert Testimony*

■ Defendants next contend it was prejudicial error for the trial court not to require plaintiff to present expert testimony establishing the standard of care or supporting the application of the standards set forth in rules 4-101 and 5-101. To support their argument, defendants rely primarily on cases from other states. (See *Beattie* v. *Firnschild* (1986) 152 Mich.App. 785 [394 N.W.2d 107]; *ABC Trans Nat., etc.* v. *Aeronautics Forwarders* (1980) 90 Ill.App.3d 817 [413 N.E.2d 1299].)

That is not the law in California. ■ "The standards governing an attorney's ethical duties are conclusively established by the Rules of Professional Conduct. They *cannot* be changed by expert testimony. If an expert testifies contrary to the Rules of Professional Conduct, the standards established by the rules govern and the expert testimony is disregarded. (Cf. *Kirsch* v. *Duryea* (1978) 21 Cal.3d 303, 311 [146 Cal.Rptr. 218, 578 P.2d

---

[4] Rule 5-101 prohibits a State Bar member knowingly acquiring a "pecuniary interest adverse to a client" unless (1) the transaction and its terms are fair and reasonable to the client and are fully disclosed in writing to the client; (2) the client is given a reasonable opportunity to consult with independent counsel; "and (3) the client consents in writing thereto."

Our Supreme Court recently concluded "that if there is evidence that the client placed his trust in the attorney because of the representation, an attorney-client relationship exists for the purposes of rule 5-101 even if the representation has otherwise ended." (*Hunniecutt* v. *State Bar* (1988) 44 Cal.3d 362, 371 [243 Cal.Rptr. 699, 748 P.2d 1161].)

935, 6 A.L.R.4th 334].)" (*Day* v. *Rosenthal, supra,* 170 Cal.App.3d 1125, 1147.)

■ A judge may resort to expert testimony to establish the standard of care when that standard is not a matter of common knowledge or where the attorney is practicing in a specialized field. In this case, the court itself was the trier of fact, and defendants' conduct did not constitute violations for which expert testimony was required. "They were violations of professional standards; standards which the trial court was compelled to notice. (Evid. Code, § 451, subd. (c).)" (*Day* v. *Rosenthal, supra,* 170 Cal.App.3d at p. 1147.) There was no error.

## C. *Timeliness of Action*

Defendants next argue that the trial court erred in failing to find plaintiff's action barred by the statute of limitations or by the doctrine of laches. Neither portion of this argument has merit.

■ Defendants first argue that this case was governed by the one-year statute of limitations relating to attorney malpractice actions. (Code Civ. Proc., § 340.6, subd. (a).) But where a cause of action is based on a defendant's breach of its fiduciary duties, the four-year catchall statute set forth in Code of Civil Procedure section 343 applies. (*Manok* v. *Fishman* (1973) 31 Cal.App.3d 208, 213 [107 Cal.Rptr. 266]; see 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 469, pp. 498-500.)

■ Similarly, the action is not barred by laches. In determining the reasonableness of a delay in filing an action, the courts are guided by the applicable statute of limitations. (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 909 [191 Cal.Rptr. 629, 663 P.2d 187].) The first account to be taken over by E&T following termination of the attorney-client relationship was that of the Sheet Metal Workers' Trust Fund in July 1981, approximately 20 months before this action was filed. That was well within the applicable four-year statute of limitations.

Defendants' major factual premise for their laches argument, however, relates back to E&T's acquisition of the account with the Western Conference of Teamsters in 1976, when its attorney-client relationship with Welch was still in being. No part of plaintiff's claim and no part of its recovery is premised upon or related to the Teamsters' account, however. David Welch testified concerning his understanding of that 1976 switch, the motivations for which were distinguishable from what later occurred. The Teamsters' decision to switch was brought about by a basic policy decision at the Teamsters' regional headquarters in Seattle that all of its collection work

throughout the Western Region was thereafter to be handled by law firms rather than collection agencies. David Welch testified that there was little he could do about the switch, "so I went along with it." There was nothing in that incident to suggest at that time that E&T was about to engage in a persistent effort to acquire most of Welch's business. This action was not barred by laches and was brought in a timely manner.

## D. *Propriety of Constructive Trust*

Defendants next contend that the trial court erred as a matter of law in granting the equitable relief of a constructive trust. A constructive trust is an equitable remedy imposed where the defendant holds title or some interest in certain property which it is inequitable for the defendant to enjoy as against the plaintiff. (*Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 373 [140 Cal.Rptr. 744].)

"The principal constructive trust situations are set forth in Civil Code sections 2223 and 2224. Section 2223 provides that '[o]ne who *wrongfully* detains a thing is an involuntary trustee thereof, for the benefit of the owner.' (Italics added.) Section 2224 provides that '[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, *or other wrongful act,* is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.' (Italics added.) The only conditions necessary to create a constructive trust are those stated in the above sections. [Citations.] In order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules. [Citation.] Thus, it has been pointed out that 'a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.' [Citations.]" (*Martin* v. *Kehl* (1983) 145 Cal.App.3d 228, 237-238 [193 Cal.Rptr. 312].)

The propriety of granting equitable relief in a particular case by way of impressment of a constructive trust generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case. (*Hicks* v. *Clayton* (1977) 67 Cal.App.3d 251, 265 [136 Cal.Rptr. 512].) Plaintiff, having been deprived of business taken from it by defendants' breach of fiduciary duty, was entitled to be restored to the extent equity could fashion a remedy. The court did not abuse its discretion in ordering the constructive trust and directing that defendants disgorge their gains.

E.-H.*

. . . . . . . . . . . . . . . . . . . . . . .

### III. CONCLUSION

The judgment is affirmed.

Anderson, P. J., and Poché, J., concurred.

---

* See footnote, *ante,* page 884.