182 Cal.App.4th 688 (2010)
OASIS WEST REALTY, LLC, Plaintiff and Respondent,
v.
KENNETH A. GOLDMAN et al., Defendants and Appellants.
No. B217141.
Court of Appeals of California, Second District, Division Five.
Filed March 3, 2010.
*691 Fairbank & Vincent, Dirk L. Vincent and Michael B. Norman for Defendants and Appellants.
Rosoff, Schiffres & Barta, H. Steven Schiffres and Robert M. Barta for Plaintiff and Respondent.

OPINION
ARMSTRONG, J.
This case presents itself as one concerning Code of Civil Procedure section 425.16 (section 425.16), the anti-SLAPP (strategic lawsuit against public participation) special motion to strike. In fact, the case primarily concerns the scope of an attorney's duty to a former client.
Defendants and appellants Reed Smith LLP, a law firm, and Kenneth A. Goldman, a partner at Reed Smith, for a time represented plaintiff and respondent Oasis West Realty, LLC, in connection with Oasis's efforts to redevelop real estate it owned in Beverly Hills. Two years after Reed Smith ended the representation, Goldman took some action in opposition to the redevelopment. Oasis sued Goldman and Reed Smith for breach of fiduciary duty, professional negligence, and breach of contract on the theory that Goldman's acts constituted a breach of appellants' ethical duties to Oasis.
Appellants filed a special motion to strike, contending that all causes of action arose from Goldman's acts "in furtherance of [his] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) The trial court held that section 425.16 did not apply because the gravamen of the action was breach of an attorney's duties of loyalty and confidentiality.
Our review is de novo review. (Tutor-Saliba Corp. v. Herrera (2006) 136 Cal.App.4th 604 [39 Cal.Rptr.3d 21].) After conducting such a review, we conclude that all causes of action in the complaint arose from acts in furtherance of protected activity, and that Oasis could not show a probability *692 of prevailing at trial. (Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564].) We thus reverse.

Facts and allegations
Oasis West owned property in Beverly Hills (City) which it wished to redevelop with a new hotel, luxury condominiums, and other improvements. (There was a Hilton hotel on the property, and the project is often referred to as the Hilton project.) The project required the approval of the Beverly Hills City Council.
On January 24, 2004, Oasis retained Reed Smith to represent it in connection with the project. Goldman was to have overall responsibility for the matter. In its complaint, Oasis alleged that it hired Reed Smith to "render advice, strategic planning and assistance in the formulation of the Project . . . and to interface with the City officials from whom Oasis sought support for the project." The complaint also alleged that Oasis sought Goldman's assistance because he was an expert in civic matters and because he was "a well-respected, influential leader who was extremely active in Beverly Hills politics." He was president of the Southwest Homeowners Association and had appeared before the city council many times to address other developments in the City. Oasis alleged that it understood that Goldman's "statements and opinions on City development matters bore significant influence on City Council members and the local citizenry," particularly members of the Southwest Homeowners Association.
Reed Smith represented Oasis in connection with the Hilton project for a little over a year, until April of 2006. During that period, Oasis paid Reed Smith about $60,000 in fees.
Oasis's complaint alleged that during the representation, Goldman "was intimately involved in the formulation of the plan for Oasis' [sic] development of the Property, its overall strategy to secure all necessary approvals and entitlements from the City and its efforts to obtain public support for the Project. Mr. Goldman was a key Oasis representative in dealing with Beverly Hills City Officials, including the Planning Commission and City Council. Throughout the representation, Oasis revealed confidences to Mr. Goldman, which it reasonably believed would remain forever inviolate."
Oasis's development proposal was put before the city council in June 2006. For the next two years, the council and the city's planning commission reviewed the project and held hearings on such things as the size of the buildings, parking, traffic, and so on. In April 2008, the council certified the *693 environmental impact report (EIR) and introduced an ordinance approving a development agreement between the City and Oasis.
Many Beverly Hills citizens opposed the project. On April 30, 2008, a political action committee called Citizens' Right to Decide Committee was formed, with the goal of putting a referendum on the ballot which would leave approval of the project up to the voters.
It was at this point that Goldman took the acts of which Oasis later complained. Oasis's complaint characterized Goldman's actions thusly: After Reed Smith terminated the representation, Goldman "switched sides," and "engaged in acts of treachery and disloyalty," intended to cause the City Council to deny permission for the project. The complaint alleged that Goldman "lent his support to a citizen's group opposed to the Project and campaigned for and solicited signatures for a Petition circulated by said citizen's group that sought to abrogate the City Council's approval of the Project and instead place approval of the Project in the hands of the citizenry by proposition . . . ."
Goldman's declaration in support of the special motion to strike is more specific. He declared that he took no part in any of the public hearings and discussions concerning the project for two years after Reed Smith's relationship with Oasis was terminated. After that, he did two things.
On May 6, 2008, he addressed the city council, opposing a rule which required individuals seeking signatures on the referendum petition to carry with them the entire EIR and other documents, totaling about 15 pounds. Goldman's statement was that the requirement was unnecessary and unfair "whether you're for the Hilton or for the Referendum."[1]
*694 On May 12, 2008, he and his wife spent about 90 minutes soliciting signatures on the referendum petition from their neighbors. At four or five houses, they left a "dear neighbor" note which they both signed, expressing concern about the size of the project and the traffic impact, indicating that they would sign the referendum petition, and urging the neighbor to do the same.
Goldman declared that he at no time disclosed confidential information to anyone, and did not believe that he disclosed that he had ever worked for Oasis in connection with the Hilton project.
By letter of May 14, 2008, Oasis demanded that Goldman and Reed Smith withdraw from all activities "that may in any manner be construed as adverse to the Project" and that they retract their opposition. Goldman and Reed Smith agreed that neither would take any additional acts in opposition to the project. Oasis's letter in response insisted that both Goldman and his wife[2] retract their support for the referendum, and "remain silent" on the issue.
With the special motion to strike, appellants also submitted a declaration from Larry Larson, who headed the citizen's committee. He detailed the committee's acts in opposition to the project, declaring in each instance that Goldman took no part in the effort. He further declared that the modest number of signatures Goldman and his wife collected made no difference to the success of the petition, that Goldman never disclosed any confidential Oasis information, and indeed that Goldman never disclosed that he had represented Oasis, so that Larson learned of the representation only from news reports concerning this lawsuit.
The citizen's committee was successful in placing the measure on the ballot, as measure H. The measure passed by a narrow margin in November of 2008, allowing the project to go forward.
Oasis filed its complaint in January 2009. It sought $4 million in damages, alleging that "but for the conduct of Mr. Goldman and Reed Smith, Oasis would not have had to spend in excess of $4 million to oppose the Petition and then to actively campaign for the approval of Measure `H.'"
With its response to the special motion to strike, Oasis submitted declarations authenticating the Reed Smith engagement letter and payment from *695 Oasis to Reed Smith of $59,963 in fees. The president of Oasis declared that Goldman had attended many team meetings, at which there was discussion and development of confidential planning and strategy with respect to the project.
Oasis also submitted a group of February 2008 e-mails (authenticated by a "cc" recipient) which include two e-mails from Goldman to the city council stating his opposition to a different project; Larson's e-mail to Goldman soliciting the Southwest Homeowners Association opposition to the Hilton project; Goldman's response to Larson recounting the association's activities in general, and, relevant to the Hilton project, stating that "Though the EIR and traffic reports for both the Hilton and 9900 state that the net traffic will not increase, I don't believe it and I am sure neither do you. My suggestion was going to be that NEITHER project be approved until something definitive and meaningful is done with the Wilshire/Santa Monica intersection"; and Larson's reply, against soliciting the Southwest Homeowners Association's support on the referendum petition.

Discussion[3]
Under section 425.16, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)
(1) An act "`in furtherance of a person's right of petition or free speech'" is statutorily defined as "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in *696 connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) "The statute's definitional focus is not on the form of the plaintiff's cause of action but rather the defendant's activity giving rise to his or her asserted liability and whether that activity constitutes protected speech or petitioning." (Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist. (2003) 106 Cal.App.4th 1219, 1232 [132 Cal.Rptr.2d 57].)
(2) "When a special motion to strike is filed, the initial burden rests with the defendant to demonstrate that the challenged cause of action arises from protected activity." (Brill Media Co., LLC v. TCW Group, Inc. (2005) 132 Cal.App.4th 324, 329 [33 Cal.Rptr.3d 371].) "In deciding whether the initial `arising from' requirement is met, a court considers `the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).)" (Navellier v. Sletten (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].)
There is no doubt that on the evidence presented here, Goldman's activities were protected activity. "The typical SLAPP suit involves citizens opposed to a particular real estate development. The group opposed to the project, usually a local neighborhood, protests by distributing flyers, writing letters to local newspapers, and speaking at planning commission or city council meetings." (Dixon v. Superior Court (1994) 30 Cal.App.4th 733, 741 [36 Cal.Rptr.2d 687], fn. omitted.)
(3) However, as Oasis argues, a substantial line of cases holds that section 425.16 does not apply to litigation which is actually about an attorney's breach of the duty of loyalty. (Benasra v. Mitchell Silberberg & Knupp LLP (2004) 123 Cal.App.4th 1179 [20 Cal.Rptr.3d 621]; Freeman v. Schack (2007) 154 Cal.App.4th 719 [64 Cal.Rptr.3d 867]; United States Fire Ins. Co. v. Sheppard, Mullin, Richter & Hampton LLP (2009) 171 Cal.App.4th 1617 [90 Cal.Rptr.3d 669]; PrediWave Corp. v. Simpson Thacher & Bartlett LLP (2009) 179 Cal.App.4th 1204 [102 Cal.Rptr.3d 245]; but see Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP (2005) 133 Cal.App.4th 658 [35 Cal.Rptr.3d 31].)
In each of these cases, a former client sued a lawyer, alleging that the lawyer undertook concurrent or subsequent representation of an adverse party under circumstances which made that second representation a violation of State Bar Rules of Professional Conduct, rule 3-310(C) (Rule 3-310(C)), on concurrent representations, or rule 3-310(E) (Rule 3-310(E)), on subsequent representations. In each case, the holding is that the case arose from the lawyer's act in accepting the second representation, rather than the litigation activities the attorney undertook on behalf of the second client.
*697 Oasis characterizes this case as one involving a subsequent representation, and a violation of Rule 3-310(E). Rule 3-310 is titled "Avoiding the Representation of Adverse Interests." Rule 3-310(E) provides that "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." We agree with appellants that there was no violation of this rule.
First, there was no second representation. Oasis's arguments to the contrary strain the facts. For instance, Oasis points out that in his comments to the city council, Goldman said that it would be unfair to require an 85 year old to carry 15 pounds of material from home to home. From this, Oasis asks us to conclude that Goldman was "representing" senior citizens. Oasis points out that the e-mails it submitted were (to the extent that they were from Goldman) from Goldman's Reed Smith account. From this, Oasis concludes that Goldman was acting as a lawyer and was representing opponents of the project generally and the Southwest Homeowners Association. Finally, Oasis cites its evidence that in March 2009, a number of Beverly Hills citizens took out an ad in the local newspaper "to support our neighbor and friend Ken Goldman," who had "recently been sued by Oasis." The many signers wrote that "We are not legal experts, but the lawsuit appears to many people to be a blatant attempt to intimidate a devoted community leader from exercising his Constitutional right to free speech."
The facts simply do not support the conclusions Oasis would have us draw.
(4) As Oasis argues, an attorney can violate Rule 3-310(E) even if the second employment does not create an attorney-client relationship. (American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton (2002) 96 Cal.App.4th 1017 [117 Cal.Rptr.2d 685] (American Airlines).) We do not see, however, that an attorney can violate the rule if there is no second attorney-client relationship or second employment of any kind.
In American Airlines, a lawyer accepted employment (as a Fed. Rules Civ.Proc., rule 30(b)(6), 28 U.S.C., witness)[4] with an entity, ADO, which was adverse to an existing client, American Airlines. American, which had objected to the employment, sued. It alleged, among other things, a breach of Rule 3-310(C), which provides that a member shall not accept representation of more than one client in a matter in which the interests of the client actually *698 or potentially conflict, without the informed written consent of each client. The lawyer defended on the theory that employment as a rule 30(b)(6) witness did not create an attorney-client relationship, and that Rule 3-310(C) only applied to such relationships. The court rejected the argument, holding that the rule "does not require representation of both clients as an attorney." (American Airlines, supra, 96 Cal.App.4th at p. 1032, original italics.) The court found that as a witness, the lawyer was an agent and fiduciary of ADO and was required to act in ADO's best interest. He also owed fiduciary duties to American, and under the facts, the duties collided, creating a violation of Rule 3-310(C). (American Airlines, supra, 96 Cal.App.4th at p. 1035; Brand v. 20th Century Ins. Co./21st Century Ins. Co. (2004) 124 Cal.App.4th 594 [21 Cal.Rptr.3d 380] [attorney may not testify as an expert witness against an insurer, where he had previously represented the insurer in substantially related matters].)
American Airlines, supra, 96 Cal.App.4th at page 1038, also considered Rule 3-310(E), rejecting the lawyer's argument concerning the clause which provides that the subsequent representation is forbidden if "`by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.'" (This is what most of the litigation on this rule concerns.) The court said, "It is anathema to the State Bar Rules of Professional Conduct to suggest that an attorney can place himself in a situation in which he undertakes adverse representation of a third party, and the client cannot object because the attorney has promised not to disclose the client's confidential information even though the information may be decidedly helpful to the new client. It is precisely this compromised situation, when the burden of deciding which client to favor is placed solely on the attorney's shoulders and within the attorney's sole power to decide, that Rule 3-310 is designed to avoid." (American Airlines, supra, 96 Cal.App.4th at p. 1039.)
But Goldman never undertook a second employment, or developed any other relationship which could create conflicting fiduciary duties. He was not placed in the position of choosing between clients, because there was no second client. The purpose of Rule 3-310(E) is "[t]o protect the confidentiality of the attorney-client relationship . . . . Where an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation." (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1146 [86 Cal.Rptr.2d 816, 980 P.2d 371].) Without a second relationship, there is no violation of Rule 3-310(E).
*699 Rule 3-310(E) is of course not the only relevant constraint on an attorney's actions. "It is the duty of an attorney to . . . maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." (Bus. & Prof. Code, § 6068, subd. (e)(1); see Rules Prof. Conduct, rule 3-100(A).)
(5) If, in opposing the Hilton project, Goldman had even hinted, or had by his conduct implied, that his opposition to the project was based on information obtained while he represented Oasis, he would have violated Business and Professions Code section 6068. One of the arguments Oasis makes is that a ruling in appellants' favor would allow a lawyer such as Goldman to buy radio or television time, tell the audience that he was once Oasis's lawyer on the project, and that he now opposed the project. Not so. "The relation of attorney and client is one of highest confidence and as to professional information gained while this relation exists, the attorney's lips are forever sealed, and this is true notwithstanding his subsequent discharge by his client . . . ." (Wutchumna Water Co. v. Bailey (1932) 216 Cal. 564, 571 [15 P.2d 505].) The conduct Oasis outlines would violate Business and Professions Code section 6068.
However, there is no evidence that Goldman revealed any confidential information, or hinted that he had such information, or created circumstances which would encourage others to think that he did and that he was basing his opposition on that information. He did not trade on his former representation of Oasis to lend credence to his opposition. Such conduct would imply that he had confidential information and was basing his actions on that information, and would be tantamount to revealing confidential information.[5]
(6) Our analysis does not end with the rules and the Business and Professions Code. An attorney's duty to a client is defined not just by the rules and statutes, but by the general principles of fiduciary relationships. The Rules of Professional Conduct do not supersede common law obligations (Santa Clara County Counsel Attys. Assn. v. Woodside (1994) 7 Cal.4th 525, 548 [28 Cal.Rptr.2d 617, 869 P.2d 1142] [abrogated by statute on other grounds]; Mirabito v. Liccardo (1992) 4 Cal.App.4th 41, 45 [5 Cal.Rptr.2d 571].) The heart of Oasis's case is not that appellants violated any rule of professional conduct, or any statute. Rather, Oasis contends that the duty of loyalty prohibited Goldman from opposing the Hilton project, and that the *700 duty of loyalty not only limits successive adverse representation, but addresses a lawyer's conduct in a private capacity.
Before further examining that argument, we turn again to the facts, and conclude that a finding that Goldman's statements to the city council breached a duty of loyalty to Oasis would stretch that duty to cartoonish proportions. In that statement, Goldman did not speak in opposition to the project; he expressed his opinion on good government practices. His position was that as a matter of good government, someone seeking a signature on a referendum petitionany referendum petitionshould not have to lug 15 pounds of material from door to door. Such a requirement might have helped Oasis by making it more difficult to obtain signatures on the referendum petition, but that is of no moment. It is all too easy to imagine instances where a former client could be harmed, or helped, by such things as public participation in government hearings, or public input on rule-making, or by voter registration drives. A lawyer may take a position, pro or con, on any of those issues, or any issue like that, without concern for the needs of former clients.
However, when Goldman asked his neighbors to sign the petition (indeed, when he signed it himself) he unquestionably acted against the interest of his former client, on the issue on which he was retained. Did this breach the duty of loyalty?
(7) "Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. (See Santa Clara County Counsel Attys. Assn. v. Woodside[, supra,] 7 Cal.4th 525, 547-548, fn. 6. . . and accompanying text.) The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. (Flatt[ v. Superior Court (1994) 9 Cal.4th 275,] 282, 285 [36 Cal.Rptr.2d 537, 885 P.2d 950].) The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship." (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at pp. 1146-1147.)
Our Supreme Court has said, and it is often quoted, that "an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any matter in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship." (Wutchumna Water Co. v. Bailey, supra, 216 Cal. at pp. 573-574.)
*701 (8) This is a sweeping statement, and read literally would bar Goldman not only from circulating the petition, but from signing it, indeed, from voting against measure H. However, all the cases which recite this rule do so in the context of subsequent representations or employment. None involve the acts an attorney takes on his or her own behalf. For that reason, although the statement is sweeping, we cannot see that those courts made any holding applicable to these facts. Cases are not authority for propositions not considered therein. (People v. Burnick (1975) 14 Cal.3d 306, 317 [121 Cal.Rptr. 488, 535 P.2d 352].)
Our Supreme Court has also said that "`It is . . . an attorney's duty to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent . . . . By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests.' (Anderson v. Eaton (1930) 211 Cal. 113, 116 [293 P. 788].)" (Santa Clara County Counsel Attys. Assn. v. Woodside, supra, 7 Cal.4th at p. 548.) Yet, that case held that the duty of loyalty did not prevent government attorneys from organizing and engaging in collective bargaining or from exercising the (then existing) statutory right to sue their client for breach of the duty to bargain in good faith, as long as representation of the client was not compromised. (Id. at p. 553.)
As appellants argue, Oasis seeks to impose something like a rule against the appearance of impropriety, but California has not adopted such a rule. "Most courts seem, at least implicitly, to recognize that, as one commentator has put it, the appearance of impropriety test is no more than `a simple and soulful rubric that seems to make intuitive sense' but whose alluring charms `are only surface.' (Wolfram, Modern Legal Ethics (1986) § 7.1.4, at p. 319.) The standard is too imprecise to furnish a reliable judicial guideline." (Gregori v. Bank of America (1989) 207 Cal.App.3d 291, 307 [254 Cal.Rptr. 853].)
One law professor has written that "Those who claim that there is some sort of conflict in situations involving friendship or public statements about policy matters do not refer to any rules, regulations, case law, or ethics opinions to support their charge. That is because the law on this subject all points the other way. Consequently, those who raise this charge are left with asserting that something must be wrong, even if they cannot explain why. They rely on the `appearance of impropriety.'" (Rotunda, Alleged Conflicts of Interest Because of the "Appearance of Impropriety" (2005) 33 Hofstra L.Rev. 1141, 1146.) The article concludes by quoting Professor Geoffrey C. Hazard, Jr., the reporter for the original American Bar Association *702 Model Rules, who referred to the appearance of impropriety standard as a "`"garbage" standard.'" (Rotenda, supra, 33 Hofstra L.Rev. at p. 1147.)
"Loyalty to a client requires subordination of a lawyer's personal interests when acting in a professional capacity. But loyalty to a client does not require extinguishment of a lawyer's deepest convictions; and there are occasions where exercise of these convictionseven an exercise debatable in professional termsis protected by the Constitution." (Johnston v. Koppes (9th Cir. 1988) 850 F.2d 594, 596.)
There is, perhaps surprisingly, little other relevant authority. Johnston, which we have just quoted, concerned a lawyer, working for the federal government, who used her vacation time to attend a public hearing on the use of state funds for abortion. She was known to have views on the subject which were contrary to the policy of her agency and she attended the hearing against the wishes of her supervisors. She was disciplined as a result. She sued under section 1983 of title 42 of the United States Code. The issue in the case was the defendants' claim of qualified immunity, on the theory that they had not violated any constitutional rights. The court found that the lawyer's conduct was protected under the First Amendment right to assemble and to petition.
Appellants cite an ethics opinion of the Association of the Bar of the City of New York, which concludes that "A lawyer may espouse a personal viewpoint adverse to the interest of a former or present client in a pending matter as long as client confidences and zealous representation of the client are not compromised." (NYC Ethics Opn. 1997-3.)
Both sides cite comments to the Restatement Third of the Law Governing Lawyers, section 125. Section 125 provides that "Unless the affected client consents to the representation . . . a lawyer may not represent a client if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's financial or other personal interests." (Boldface omitted.) Comment b explains the rationale: "Personal interests of a lawyer that are inconsistent with those of a client might significantly limit the lawyer's ability to pursue the client's interest." (Rest.3d Law Governing Lawyers, § 125, com. b. p. 313.)
Comment e concerns, "A lawyer openly expressing public-policy views inconsistent with a client's position." (Rest.3d Law Governing Lawyers, § 125, com. e, p. 315, italics omitted.) It begins, "In general, a lawyer may publicly take personal positions on controversial issues without regard to whether the positions are consistent with those of some or all of the lawyer's clients. Consent of the lawyer's clients is not required. Lawyers usually *703 represent many clients, and professional detachment is one of the qualities a lawyer brings to each client. Moreover, it is a tradition that a lawyer's advocacy for a client should not be construed as an expression of the lawyer's personal views. Resolution of many public questions is benefited when independent legal minds are brought to bear on them. For example, if tax lawyers advocating positions about tax reform were obliged to advocate only positions that would serve the positions of their present clients, the public would lose the objective contributions to policy making of some persons most able to help." (Rest.3d Law Governing Lawyers, § 125, com. e, p. 315.)
Oasis likes the second paragraph of the comment: "However, a lawyer's right to freedom of expression is modified by the lawyer's duties to clients. Thus, a lawyer may not publicly take a policy position that is adverse to the position of a client that the lawyer is currently representing if doing so would materially and adversely affect the lawyer's representation of the client in the matter. The requirement that a lawyer not misuse a client's confidential information . . . similarly applies to discussion of public issues." (Rest.3d Law Governing Lawyers, § 125, com. e, p. 315.)
(9) These authorities stand for the proposition that a lawyer may take positions adverse to a client, as long as current representation is not compromised, something which does not concern us, and as long as confidentiality is not compromised.
We thus see no authority for a rule which would bar an attorney from doing what Goldman did here: signing a petition in opposition to the Hilton project, and asking his neighbors to sign such a petition, when he had once represented the developer concerning the project. To the extent that Oasis asks us to create such a rule, we decline the invitation. We cannot find that by representing a client, a lawyer forever after forfeits the constitutional right to speak on matters of public interest.
(10) Once a moving defendant on a special motion to strike meets its burden to demonstrate that the complaint arises out of protected acts, the burden shifts to the plaintiff to establish that there is a probability that he will prevail on the claim. (§ 425.16, subd. (b)(1).) In order to establish a probability of prevailing, a plaintiff must "`state[] and substantiate[] a legally sufficient claim.'" (Briggs v. Eden Council for Hope & Opportunity, supra, 19 Cal.4th at p. 1123.) (11) Because there was no breach of duty, Oasis did not show a legally sufficient claim. Moreover, while Oasis alleged that Goldman's activities caused it $4 million in damages, the total amount it spent as a result of the petition and referendum, it presented no evidence that Goldman caused those damages.

*704 Disposition
The judgment is reversed. Appellants to recover costs on appeal.
Turner, P. J., and Kriegler, J., concurred.
NOTES
[1] He supplied a transcript of his remarks. In full, it reads: "Good evening members of the Council. I am here to speak on a very narrow issue concerning the Hilton that has been discussed and alluded to tonight. It is hard for me to believe that anyone in this Chamber would view it as being fair, whether you're for the Hilton or for the Referendum, to have to carry around 15 1/2 pounds of material from home to home to home to home, whether you're 15 years old or 85 years old. It's never been done. [¶] We all know it's not necessary to inform anybody to whom a petition is being presented. They don't need to read the entire EIR, the entire draft EIR, never been done. I dare say 99 percent of the people in this room, whether they are for the Hilton or whether they are against the Hilton, none of them have read the entire EIR and DEIR. It's just not necessary. You can take the executive summary, you can take the resolution. [¶] I know every single one of you. I know every single one of you is fair and right and I cannot believe that you would think it is fair and right, whether you're for it or against it, to have someone, to require someone to carry that kind of material around with them when they are trying to seek whatever they are trying to seek. We've never done this before in this city, we shouldn't do it now. It's just not right; again, whether you're for the Hilton or for the Referendum. Don't require it, because it's not fair and each of the five of you knows that. It's not right. It's not necessary to inform the citizenry. There's a lot of material there. Nobody is going to read through that. Nobody that's spoken tonight, I guarantee you, I haven't read through that. Thank you."
[2] Oasis wrote that since the "dear neighbor" letter was signed by both Goldman and his wife, they were mutual agents of each other.
[3] The court also found an ethical violation in Goldman's failure to disclose his personal relationship with the City of Beverly Hills as an active citizen, and failure to disclose a potential personal conflict. Oasis did not advance this theory in its complaint or in proceedings on the special motion to strike, and does not advance it on appeal. In fact, the complaint alleges that Oasis knew when it hired Reed Smith that Goldman was active in Beverly Hills politics. The judgment cannot be affirmed on that ground.
[4] As American Airlines explained, "the function of such a witness is to testify on behalf of a corporation or other organization as to matters known or reasonably available to the organization, and specifically as to those matters described in the deposition notice." (American Airlines, supra, 96 Cal.App.4th at p. 1025, fn. 3.)
[5] In a footnote, Oasis argues that Goldman's e-mail statement that he did not believe the EIR's which stated that the Hilton project and another project would have no traffic impact suggested that he had confidential information about the Hilton project. We do not see that the e-mail can be so construed. There is no indication that Goldman had access to confidential information on the second project, and the e-mail states that he disbelieves the official reports on that one, too. He also expresses his confidence that Larson, who seems to have no confidential information, disbelieves the reports.