[No. B149863. Second Dist., Div. Seven. Feb. 20, 2002.]

CITY NATIONAL BANK, Plaintiff, Cross-defendant and Respondent, v. GLENN ADAMS, Defendant, Cross-complainant and Appellant.

COUNSEL

Law Offices of Jeffrey L. Davidson, Jeffrey L. Davidson, Benjamin M. Hill and Laura Lynn Davidson for Defendant, Cross-complainant and Appellant.

Feinberg, Mindel & Kline, Jeremy B. Kline and Irwin B. Feinberg for Plaintiff, Cross-defendant and Respondent.

## OPINION

**PERLUSS, J.**—Defendant Glenn Adams appeals from the trial court's order disqualifying his counsel, Jeffrey L. Davidson and Davidson's law firm, from further participation in this action based on Davidson's previous representation of plaintiff City National Bank (CNB). We hold that, absent the informed written consent of both the former client and the present client, a lawyer may not represent a party whose interests are adverse to his or her former client when the two representations are in the same matter or the current representation involves the work performed by the lawyer for the former client. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Loan, the Collateral and the Davidson Opinion Letter.*

On April 30, 1998 CNB loaned $150,000 to Adams; and Adams executed and delivered to CNB a promissory note (the note) agreeing to repay the principal sum plus interest. The purpose of the loan was to enable Adams to exercise options to purchase stock in U.S. Digital Communications, Inc. (U.S. Digital). The loan was to be secured by the shares purchased with the loan proceeds (the stock).

Pursuant to his agreement with CNB, Adams was required to maintain collateral equal to at least 50 percent of the outstanding balance on his loan.

The stock began to decline in value in early 1999 and soon became insufficient as collateral. Adams advised CNB he could not repay the loan or pledge additional collateral and asked CNB to sell the stock to satisfy his obligation.

CNB told Adams it appeared it could not sell the stock because it bore a restrictive legend. At Adams's suggestion, CNB retained Davidson in June 1999 to provide a legal opinion that the restrictive legend could be removed and the stock sold. Davidson provided the opinion letter on August 3, 1999. In June 2000 U.S. Digital went out of business, and the stock became worthless.

### 2. *The CNB v. Adams Lawsuit.*

CNB filed suit against Adams for breach of contract, money had and received and overdraft on May 25, 2000. Adams filed a cross-complaint for breach of contract on July 14, 2000. In his answer and cross-complaint, Adams alleged that CNB failed to sell the stock in a timely manner. Adams also alleged that, if CNB had sold the stock in a timely manner, the proceeds would have exceeded his obligations to CNB. Adams's cross-complaint avers "CNB's failure to liquidate the Security and apply the proceeds to satisfy Adams'[s] obligations to CNB under the Note constitute a breach of CNB's duty to Adams under the terms of the note."

### 3. *The Motion to Disqualify Davidson as Adams's Counsel.*

At the time he filed his answer and cross-complaint, Adams was represented by Daniel Gunning. The trial court granted Mr. Gunning's motion to withdraw as Adams's counsel on February 6, 2001. CNB moved for summary judgment on March 29, 2001. Adams retained Davidson as his counsel on March 15, 2001. After its motion for summary judgment was denied, CNB filed a motion to disqualify Davidson on the ground he had previously represented CNB in the same matter.

#### a. *The Craig Declaration.*

In support of its motion to disqualify, CNB submitted the declaration of David Craig, the CNB vice-president responsible for managing CNB's relationship with Adams. Craig testified in his declaration as follows:

In April 1999 Craig contacted Adams and told him that the U.S. Digital stock was insufficient to maintain the required balance of collateral to the outstanding loan. Adams told Craig he could not pay the loan or pledge

additional collateral, but was going to sell his business and either pay off the loan or provide additional collateral out of the sale proceeds.

During his conversations with Craig, Adams asked if CNB could sell the U.S. Digital stock it held as collateral. Craig informed Adams that CNB could not sell the stock until the restrictive legend was removed and that the legend could not be removed without an opinion letter from legal counsel. Adams suggested Craig contact Davidson to obtain the opinion letter. Because CNB did not have any in-house attorneys who could write such an opinion letter, Craig and CNB regional vice-president Bob Patterson decided to retain Davidson as counsel on behalf of CNB to write the necessary letter.

Craig spoke to Davidson on June 22, 1999: "I advised him that CNB would like to engage his services to write an outside attorney's opinion letter. The opinion letter was to address whether City National Bank could now liquidate the 150,000 shares of U.S. Digital stock under the Rule 144 restrictions. Previously, Debra Bernstein of Southwest Securities, (the company that handled stock transactions on behalf of CNB) informed me that the USDI stock could not be sold until the restrictive legend had been removed. I discussed with Mr. Davidson CNB's concerns that CNB's borrower was asking CNB to liquidate the collateral, but that we could not liquidate the collateral because any sale would violate the Rule 144 restrictions. Therefore, I was relying on Mr. Davidson to issue the necessary opinion letter to enable CNB to sell the stock without violating any rules or regulations. Mr. Davidson quoted me a fee of $750.00 to prepare the opinion letter."

Craig confirmed his conversation in a letter to Adams, dated June 22, 1999: "Per our conversation today, City National Bank would like to engage your services with respect to an outside attorney's opinion. This opinion relates to City National Banks [sic] ability to liquidate stock currently under rule 144 restrictions. Our borrower, Glenn Adams owns 150,000 shares of US Digital Communications stock (USDI) under this restriction used to secure a loan with the bank. The fee, as discussed today, shall be $750.00. If you could provide your opinion at your earliest convenience, it would be greatly appreciated."

Craig believed he had hired Davidson to act as CNB's counsel in the matter: "By agreeing to pay Mr. Davidson's $750.00 fee, I understood that Mr. Davidson was now working for CNB to write the necessary opinion letter. I presumed that Mr. Davidson was now working as CNB's attorney and my communications with him were privileged. Although I understood that Mr. Davidson and Mr. Adams had worked together in the past in connection with other companies, Mr. Davidson never told me that he was in

the past, or was currently Mr. Adams'[s] personal attorney. Mr. Davidson never provided me a retainer agreement, conflict of interest waiver, or similar document advising me that Mr. Davidson was working for Mr. Adams. . . . [¶] . . . [¶] During the period that I dealt with Mr. Davidson, I always understood and assumed that I was hiring him to act as attorney for CNB and not Mr. Adams. I understood that Mr. Adams knew Mr. Davidson, but that Davidson was not his personal attorney. I always assumed that my communications with Mr. Davidson were confidential pursuant to the attorney-client privilege and that Mr. Davidson would act on behalf of CNB to ensure that CNB did not violate any rules and regulations if it sold Mr. Adams'[s] collateral."

Davidson did not provide the requested opinion letter until August 1999. At that point "the stock had already substantially declined in value and was not sufficient to pay off Mr. Adams['s] debt. By this time, Mr. Adams was in the middle of selling his business and he hoped to provide other collateral to CNB that would enable him to retain his USDI stock. Mr. Adams was hoping the USDI stock would recover some of its previous value."

b. *The Davidson Declaration.*

In opposition to the motion to disqualify, Adams filed a declaration from Davidson himself. Davidson's declaration discussed his background in securities law and described generally the effect of rule 144, promulgated by the Securities and Exchange Commission (17 C.F.R. § 230.144 (2001)), on the sale of securities that have not been registered under the Securities Act of 1933.

Davidson declared he was outside counsel for U.S. Digital and that by 1999 he "had represented Mr. Adams in various matters for a couple of years." He had "rendered forty to fifty opinions to U.S. Stock Transfer concerning the transferability of U.S. Digital shares bearing restrictive legends," and this was *"a usual and customary engagement for a public company's outside counsel."* U.S. Digital declined to pay for any further opinion letters in March 1999, however, and "referred its shareholders to me for opinions on its stock."

Davidson maintained he drafted the opinion letter for the benefit of Adams, not CNB. He stated he did not recall ever having spoken with Craig or receiving a letter from him. He also stated "During my conversation with the CNB representative concerning the opinion letter, I did not receive any confidential communications. I simply ascertained the same information that I need from any person who decided to sell restricted stock: (1) Holding

period, (2) Share certificate number, and (3) broker-dealer representation as to manner of sale. There was no need for me to acquire confidential information, and I did not do so. All of the information I got from CNB is set forth in the opinion letter itself. [¶] . . . I have never represented City National Bank."

### 4. The Trial Court's Ruling.

At the hearing on the motion to disqualify, the trial court stated: "The court finds you [Davidson] have been retained by City National Bank before in this case in connection with the same matter that is involved in this litigation and that your representing the defendant in this case constitutes a conflict of interest and your continued representation would constitute a breach of confidentiality." The motion was granted on April 12, 2001.

Adams filed a timely notice of appeal.

### DISCUSSION

### 1. The Standard of Review.

■ We review a trial court's decision on a disqualification motion for abuse of discretion, accepting as correct all of its express or implied findings supported by substantial evidence. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).)

"In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable." (*Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860 [80 Cal.Rptr.2d 634]; see also *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 603 [168 Cal.Rptr. 196] [declarations in favor of the prevailing party must be taken as true, " 'and the facts stated therein must be considered established' "]; *Katz v. Wahrhaftig* (1952) 113 Cal.App.2d 447, 450 [248 P.2d 32] [under substantial evidence standard, " ' "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," which will support the findings, and when "two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its

deductions for those of the trial court" ' "].) We presume the trial court found for the prevailing party on all disputed factual issues. (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1734 [20 Cal.Rptr.2d 756]; see also *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co., supra,* 68 Cal.App.4th 856, 860.)

We will reverse the trial court's ruling only where there is no reasonable basis for its action. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732].) However, we must also ensure that the trial court has made a reasoned judgment that complies with the applicable legal standard. (*Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.* (1999) 69 Cal.App.4th 1399, 1403 [82 Cal.Rptr.2d 326].)

### 2. The Rules Governing Disqualification of an Attorney Who Is Improperly Proceeding Against a Former Client.

■ "It has long been established in civil cases that the court has the power, on motion of a party, to disqualify an opposing attorney from participating in a trial when, for example, the attorney improperly seeks to proceed against a former client. [Citations.]" (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 263-264 [137 Cal.Rptr. 476, 561 P.2d 1164].) The power to disqualify an attorney is simply one aspect of the trial court's broad authority "[t]o control in furtherance of justice, the conduct of its ministerial officers . . . ." (Code Civ. Proc., § 128, subd. (a)(5); *SpeeDee Oil, supra,* 20 Cal.4th at p. 1145; *Comden v. Superior Court* (1978) 20 Cal.3d 906, 916, fn. 4 [145 Cal.Rptr. 9, 576 P.2d 971, 5 A.L.R.4th 562].)

The prohibition against representation of a new client whose interests are adverse to those of a former client is grounded in both the California State Bar Rules of Professional Conduct and governing case law.[1] Rule 3-310(E) provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

■ More broadly, our Supreme Court has explained "an attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his

---

[1]Rule 1-100 of the California State Bar Rules of Professional Conduct provides that "[t]he prohibition of certain conduct in these rules is not exclusive. Members are also bound by applicable law including . . . opinions of California courts."

All further rule references are to the California State Bar Rules of Professional Conduct.

former client in any matter in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship." (*Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564, 573-574 [15 P.2d 505].)[2] The prohibition is in the disjunctive. An attorney "may not use information *or* 'do anything which will injuriously affect his [or her] former client.' " (*People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 156 [172 Cal.Rptr. 478, 624 P.2d 1206].)

A lawyer who accepts employment in violation of these rules is subject to disqualification upon motion of the former client. (*Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 113-114 [14 Cal.Rptr.2d 184] (*Henriksen*).)

"[D]etermining whether a conflict of interest requires disqualification involves more than just the interests of the parties. [¶] . . . The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. [Citations.]" (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1145.)

### 3. *The "Substantial Relationship" Test.*

Application of the rule against representations adverse to a former client has focused on whether there is a "substantial relationship" between the former and current representation. The substantial relationship test was first articulated in *T.C. & Theatre Corp. v. Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268: "[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject

---

[2]The standard for evaluating whether representation adverse to the interests of a former client is prohibited, absent informed written consent by all affected present and former clients, articulated 70 years ago in *Wutchumna Water Co. v. Bailey, supra,* 216 Cal. 564, is echoed in the recent pronouncement by the American Law Institute: "Unless both the affected present and former clients consent to the representation under the limitations and conditions provided in § 122, a lawyer who has represented a client in a matter may not thereafter represent another client in the same or a substantially related matter in which the interests of the former client are materially adverse. The current matter is substantially related to the earlier matter if: [¶] (1) the current matter involves the work the lawyer performed for the former client; or [¶] (2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known." (Rest.3d The Law Governing Lawyers, § 132, pp. 376-377.)

matter of the representation. It will not inquire into their nature and extent." (See also *Trone v. Smith* (9th Cir. 1980) 621 F.2d 994, 998 ["The relevant test for disqualification is whether the former representation is 'substantially related' to the current representation. [Citations.] The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all its dimensions. It is necessary to preserve the value attached to the relationship both by the attorney and by the client. These objectives require a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one. [Citation.] Substantiality is present if the factual contexts of the two representations are similar or related."].)

The substantial relationship test was adopted by California courts in a line of cases beginning with *Global Van Lines, Inc. v. Superior Court* (1983) 144 Cal.App.3d 483 [192 Cal.Rptr. 609] (*Global Van Lines*). In *Global Van Lines,* the court held that "[w]hen a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible, the attorney's knowledge of confidential information is presumed. [Citation.] [¶] This is the rule by necessity, for it is not within the power of the former client to prove what is in the mind of the attorney." (*Id.* at p. 489.)

The substantial relationship test as announced in *Global Van Lines* found wide acceptance among California courts. (See, e.g., *Civil Service Com. v. Superior Court* (1984) 163 Cal.App.3d 70, 80 [209 Cal.Rptr. 159]; *Dill v. Superior* Court (1984) 158 Cal.App.3d 301, 304 [205 Cal.Rptr. 671].)

In *H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445 [280 Cal.Rptr. 614] (*Ahmanson*), however, this division explained that problems might arise if courts inflexibly adhere to the conclusive presumption of the exchange of confidential information. We noted that the "prophylactic approach to disqualification" embodied in the substantial relationship test is "overinclusive[, and] may impose a significant hardship on the current client. It may unfairly limit the employment opportunities of lawyers. And, finally, it may stifle development of expertise in complex areas of law." (*Id.* at p. 1453.) We also recognized that another "problem inherent in the 'substantial relationship' approach is just what meaning to give those two words." (*Ibid.*) And finally, we acknowledged the unfortunate reality that "disqualification motions based on an alleged substantial relationship between representations are commonly used for purely strategic purposes to

delay the litigation, harass the opposing party or pressure for a more favorable settlement." (*Id.* at p. 1454.) Based on these difficulties, "the substantial relationship test has undergone modifications and refinements since it was first announced in *T. C. & Theatre Corp.* in 1953. These changes have focused primarily on the requirements that trigger the conclusive presumption the attorney possesses confidences which could prejudice the former client in the present matter. Thus, the rule followed in California is that the attorney's possession of confidential information will be presumed only when ' "a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney . . . ." ' [Citations.] [¶] Under the *Global Van Lines* formulation of the test, the courts focus less on the meaning of the words 'substantial' and 'relationship' and look instead at the practical consequences of the attorney's representation of the former client. The courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation. [Citation.]" (*Ibid.*)

*Ahmanson, supra,* 229 Cal.App.3d 1445 established a "pragmatic approach, which focuses on the nature of the former representation," and does not compel disqualification " 'when there is no realistic chance that confidences were disclosed' " in the prior representation. (*Id.* at p. 1455.) This "pragmatic approach" examines " 'the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases.' " (*Ibid.*)

■ Several years after the *Ahmanson* decision, the Supreme Court adopted the substantial relationship test in *Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*): "Where the potential conflict is one that arises from the *successive* representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality.* Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations. [¶] The 'substantial relationship' test mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation on the other. Where the requisite

substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm. [Citations.]" (*Id.* at p. 283.)

In *SpeeDee Oil* the Supreme Court reaffirmed *Flatt, supra,* 9 Cal.4th 275, holding that "[w]here an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation. [Citation.]" (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1146.) The Supreme Court also emphasized the importance of protecting "public trust in the scrupulous administration of justice and the integrity of the bar." (*Id.* at p. 1145.) Thus in addition to confidentiality concerns, "[a] related but distinct fundamental value of our legal system is the attorney's obligation of loyalty. Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. [Citation.] The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. [Citation.]" (*Id.* at p. 1146.)

■ Our analysis of the case law involving successive representation of clients leads us to three conclusions that guide resolution of this case. First, if the nature of the representation is such that confidences *could have* been exchanged between the lawyer and the client, courts will conclusively presume they *were* exchanged, and disqualification will be required. (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1331 [104 Cal.Rptr.2d 116] [" ' "[w]hen a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his [or her] former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible, the attorney's knowledge of confidential information is presumed" ' "]; accord, *Global Van Lines, supra,* 144 Cal.App.3d at p. 489; *Rosenfeld Construction Co. v. Superior Court* (1991) 235 Cal.App.3d 566, 574 [286 Cal.Rptr. 609]; *Johnson v. Superior Court* (1984) 159 Cal.App.3d 573, 578 [205 Cal.Rptr. 605]; *Ahmanson, supra,* 229 Cal.App.3d at p. 1454; *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 563 [20 Cal.Rptr.2d 132].)

Second, there is a limited exception to this conclusive presumption in the rare instance where the lawyer can show that there was no *opportunity* for

confidential information to be divulged. (*Ahmanson, supra,* 229 Cal.App.3d at p. 1455 [disqualification not required " 'when there is no realistic chance that confidences were disclosed' " between lawyer and client]; *Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at pp. 1340-1341 [attorney who switched law firms has the burden of proving he had no exposure to confidential information relevant to the current action while he was a member of firm representing current client's adversary].)

Third, the limited exception is *not* available when the lawyer's former and current employment are on opposite sides of the very same matter or the current matter involves the work the lawyer performed for the former client. When the lawyer switches sides in an ongoing dispute such as the one between the parties in this case, the nature of the former representation will *always* be such that the exchange of relevant confidences must be presumed. (See *Civil Service Com. v. Superior Court, supra,* 163 Cal.App.3d at p. 80 [county counsel may not represent the county on "precisely the same matter" as to which it previously advised the county's adversary]; *Henriksen, supra,* 11 Cal.App.4th at p. 115 [rule requiring disqualification of entire law firm "is especially true where the attorney's disqualification is due to his prior representation of the opposing side during the same lawsuit"] *Dill v. Superior Court, supra,* 158 Cal.App.3d 301, 306 [lawyer's "former personal involvement on [opposite side] in the identical action" constitutes "compelling reason for disqualification" of entire law firm].)[3] This rule springs from the fact that all attorney-client communications are presumptively confidential (Evid. Code, §§ 917, 952) and any communications between the lawyer and client in the first representation must necessarily have been material to ongoing matter in which the lawyer has switched sides. (*Grove v. Grove Valve & Regulator Co.* (1963) 213 Cal.App.2d 646, 653 [29 Cal.Rptr. 150] ["[T]here can be no reasonable doubt that Flehr's present employment as attorney for appellant in this action is adverse to the interests of his former clients, since appellant is suing them over matters which are related to and which Flehr became conversant with during the period in which he represented respondents as their attorney."].)

---

[3]We are aware that the court in *In re Marriage of Zimmerman, supra,* 16 Cal.App.4th 556, reversed an order of disqualification even though the matter was the same. However *Zimmerman* is distinguishable on two grounds. First, *Zimmerman* was an imputed disqualification case: The attorney who was involved in the initial client contact was *not* the attorney who later represented the client's adversary. Second, the lawyer in *Zimmerman* never actually represented the client, but only engaged in a single telephone call that concluded with the attorney's advice that the client retain a specialist in family law. We disagree with *Zimmerman* to the extent it held that, even where the past and present representations are in the same case, there is an "additional and separate requirement that the nature of the former representation or relationship of the attorney to his [or her] former client be such that confidential information material to the current dispute 'would normally have been imparted to the attorney.' [Citations.]" (*Id.* at p. 564.) In our view the inquiry should stop once the client has established that the former and current representations are in the same case.

Such cases implicate the lawyer's duty of loyalty as well as confidentiality. As the Supreme Court stated in *People ex rel. Deukmejian v. Brown, supra,* 29 Cal.3d 150, "the prohibition is in the disjunctive: [The lawyer] may not use information *or* 'do anything which will injuriously affect his [or her] former client.'" (*Id.* at p. 156.) Where the lawyer switches sides and represents the former client's adversary in the same matter, everything the lawyer does for the new client necessarily will injuriously affect the former client.

4. *The Trial Court Did Not Abuse Its Discretion in Granting CNB's Motion to Disqualify Davidson.*

■ Based on these principles, we conclude the trial court's findings were supported by substantial evidence and its legal reasoning was sound.[4]

a. *There Was an Attorney-client Relationship Between Davidson and CNB.*

Davidson contends he was not CNB's attorney "for conflict of interest purposes." However, the trial court found that Davidson was retained by CNB to act as its counsel. That finding is supported by substantial evidence in the form of the Craig declaration and the letter from Craig to Davidson.

b. *Davidson Switched Sides In the Adams/CNB Matter.*

Davidson contends that his representation of CNB for the purpose of writing an opinion letter regarding the transferability of Adams's U.S. Digital stock is not substantially related to his representation of Adams in the present lawsuit. The trial court rejected this argument, finding that the prior representation was in the "same matter" as the current representation. We agree with the trial court. Adam's affirmative defenses and cross-complaint in the present lawsuit are based on his contention that CNB should

---

[4]Adams argues that the trial court improperly based its ruling, in part, "not only [on] actual disclosure, but the appearance of disclosure." However, the trial court's remarks, read in context, are entirely consistent with our conclusion that a lawyer who switches sides in the same case violates principles of both confidentiality and loyalty. (See *SpeeDee Oil, supra,* 20 Cal.4th at p. 1157 [attorney owes client "twin duties of loyalty and confidentiality"]; *Civil Service Com. v. Superior Court, supra,* 163 Cal.App.3d at p. 79 ["While the concept of confidentiality may be the touchstone of adverse prior representation analysis, other considerations are relevant as well. Courts have long been concerned about the prospect of a swearing contest between the attorney and former client as to whether the attorney had access to confidential information in the course of the former representation."]; *Henriksen, supra,* 11 Cal.App.4th at p. 113 [fiduciary nature of lawyer-client relationship "requires the application of strict standards"].) This case illustrates the perils of the "swearing contest" both in the trial court and here, where Davidson continues, despite the trial court's order, to represent Adams against his former client. (See *Civil Service Com. v. Superior Court, supra,* 13 Cal.App.3d at p. 80.)

have sold the stock in order to satisfy Adams's liability on the note. Davidson was retained to provide an opinion letter directed to the same issue. The conditions under which the stock could be sold to satisfy the debt are at the very heart of the current litigation. The two representations are both factually and legally intertwined.

    c.   *We Conclusively Presume That Davidson Received Confidential Information from CNB Relating to the Matter in Which He Now Represents Adams Against CNB.*

Adams argues Davidson need not be disqualified because his representation of CNB falls within the limited exception to the substantial relationship test for situations in which the attorney was not in a position to receive confidential information from the former client. Indeed, Adams devotes much of his brief on appeal to arguing the evidence presented in connection with the motion to disqualify. For example, he challenges the credibility of Craig's declaration and argues the trial court's ruling "fails to acknowledge" certain facts he contends are established by his own evidence. We decline Adams's invitation to substitute our view of the evidence for that of the trial court. (*SpeeDee Oil, supra,* 20 Cal.4th 1135, 1143 ["If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.]"]; *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co., supra,* 68 Cal.App.4th at p. 860 ["In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.]."])

We also reject Adams's argument for the reason explained above: When the prior and current representations are in exactly the same matter or involve the work performed by the lawyer for the former client, there is no exception to the conclusive presumption of the exchange of confidential information. Absent the former client's informed written consent, an attorney may never switch sides in an ongoing legal matter.

Moreover, the trial court found that Adams did receive confidential information, and this finding is supported by substantial evidence in the form of the Craig declaration. Craig's declaration establishes that, at the very least, Davidson had the *opportunity* to receive confidential information in connection with CNB's relationship with Adams and its dispute about the note. Therefore, even if the presumption of the exchange of confidential information were rebuttable rather than conclusive in this case, Davidson has not rebutted the presumption.

## DISPOSITION

The order of the trial court is affirmed. CNB is to recover its costs on appeal.

Lillie, P. J., and Johnson, J., concurred.