[No. G043502. Fourth Dist., Div. Three. May 24, 2011.]

ORANGE COUNTY WATER DISTRICT, Plaintiff and Respondent, v. THE ARNOLD ENGINEERING COMPANY et al., Defendants and Appellants.

1112

COUNSEL

Lewis Brisbois Bisgaard & Smith, R. Gaylord Smith and Malissa Hathaway McKeith for Defendant and Appellant Northrop Grumman Systems Corporation.

Musick, Peeler & Garrett, Donald E. Bradley and Steven Jay Elie for Defendant and Appellant The Arnold Engineering Company.

Gallagher & Gallagher and Martin Neal Refkin for Defendant and Appellant Moore Wallace North America, Inc.

Higgs Fletcher & Mack, Alexis Sean Gutierrez and Michael Robert Gibson for Defendant and Appellant MAG Aerospace Industries, Inc.

Holme Roberts & Owen and Linnea Brown for Defendant and Appellant CBS Broadcasting, Inc.

Gordon & Rees and Jack Bramwell McCowan, Jr., for Defendant and Appellant Telex Communications Holdings, Inc.

Kavinoky Cook and Deborah J. Chadsey for Defendant and Appellant Mark IV Industries, Inc.

Dongell Lawrence Finley and Paul David Rasmussen for Defendants and Appellants Crucible Material Corp. and Mark IV Industries, Inc.

Tatro Tekosky Sadwick and René P. Tatro for Defendant and Appellant Alcoa Global Fasteners, Inc.

Connor Fletcher & Williams, Edmond M. Connor; Miller, Axline & Sawyer, Duane C. Miller, Michael Axline and Evan Eickmeyer for Plaintiff and Respondent.

---

OPINION

**ARONSON, J.**—Defendants appeal a trial court order denying their motion to disqualify the law firm of Miller, Axline & Sawyer (Miller Firm) from representing plaintiff Orange County Water District (Water District) in this action.[1] Defendants contend the decisions in *County of Santa Clara v.*

---

[1] The defendants jointly appealing the trial court's order are Northrop Grumman Systems Corporation, The Arnold Engineering Company, Moore Wallace North America, Inc., MAG

*Superior Court* (2010) 50 Cal.4th 35 [112 Cal.Rptr.3d 697, 235 P.3d 21] (*Santa Clara*) and *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740 [218 Cal.Rptr. 24, 705 P.2d 347] (*Clancy*) require disqualification because the Water District agreed to pay the Miller Firm a contingency fee for prosecuting this public nuisance abatement action on the public's behalf. According to defendants, the Miller Firm's financial interest in this litigation conflicts with the heightened duty of neutrality *Clancy* and *Santa Clara* impose on any attorney prosecuting a public nuisance action for the public's benefit. The trial court denied defendants' motion after finding the Water District did not bring this action on the public's behalf, but rather to recover compensatory damages allegedly caused by defendants' contamination of certain groundwater aquifers. We agree and affirm the trial court's order.

I

FACTS AND PROCEDURAL HISTORY

The Legislature created the Water District to manage, regulate, replenish, and protect the groundwater basin generally covering the northern half of Orange County. (See Stats. 1993, ch. 213, § 2, p. 1548, West's Ann. Wat.—Appen. (2010 ed.) § 40-1 et seq., p. 138.) The Water District provides water to more than two million users, but it is not a water retailer and does not provide water directly to the public. Nineteen water producers, including cities, other water districts, and private water companies, pump water from the Water District's groundwater basin and sell it to the public.

In 2004, after investigating contamination discovered in groundwater aquifers underlying Anaheim and Fullerton, the Water District's board of directors voted to begin litigation to recover the costs of investigating and remediating the groundwater contamination. The board thereafter interviewed several law firms before hiring the Miller Firm. The Water District retained ultimate decisionmaking authority regarding all litigation and required the Miller Firm to obtain authorization to file litigation on a case-by-case basis. Although the details regarding the fee agreement between the Water District and the Miller Firm are not in the record, the Water District acknowledges it agreed to pay the Miller Firm a contingency fee.

The Miller Firm filed this action on the Water District's behalf in December 2004, alleging defendants and other entities that owned, operated, or leased industrial facilities in Anaheim and Fullerton caused the groundwater

---

Aerospace Industries, Inc., CBS Broadcasting, Inc., Telex Communications Holdings, Inc., Mark IV Industries, Inc., Crucible Material Corp., Alcoa Global Fasteners, Inc. (collectively, defendants).

contamination by discharging and dumping hazardous waste. The Water District's first amended complaint alleged six causes of action, including statutory claims under its enabling legislation (Stats. 1993, ch. 213, § 2, p. 1548, West's Ann. Wat.—Appen., *supra*, § 40-1 et seq., p. 138) and the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.). It also brought negligence, public nuisance, trespass, and declaratory relief claims. The Water District sought compensatory damages for all investigation and remediation costs associated with the contamination and, on its public nuisance claim, an order compelling defendants to abate the nuisance.

In March 2010, defendants moved to disqualify the Miller Firm when they discovered it represented the Water District under a contingency fee agreement. Defendants argued *Clancy* prohibited a public entity from paying a private attorney a contingency fee to prosecute a public nuisance abatement action. According to defendants, an attorney prosecuting a public nuisance action on the public's behalf may not have a financial stake in the litigation because the attorney must remain neutral when acting as a representative of the public exercising the government's sovereign powers.

The trial court denied the motion, finding *Clancy* did not apply because the Water District did not pursue this action on the public's behalf. Rather, the trial court found the Water District brought this action on its own behalf to recover remediation costs and other damages it suffered distinct from any damages the public suffered. As an alternative ground for denying the motion, the trial court found defendants unreasonably delayed bringing their motion to disqualify.

Defendants filed a timely notice of appeal.[2]

II

DISCUSSION

A. *Standard of Review*

We review a trial court's decision on a disqualification motion for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).) " 'In viewing the evidence, we look only to the evidence

---

[2] An order granting or denying a motion to disqualify counsel is immediately appealable as an injunction order. (*Machado v. Superior Court* (2007) 148 Cal.App.4th 875, 882 [55 Cal.Rptr.3d 902].)

supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable.' [Citations.] We presume the trial court found for the prevailing party on all disputed factual issues. [Citations.]" (*City National Bank v. Adams* (2002) 96 Cal.App.4th 315, 322–323 [117 Cal.Rptr.2d 125] (*Adams*).)

"We will reverse the trial court's ruling only where there is no reasonable basis for its action. [Citation.] However, we must also ensure that the trial court has made a reasoned judgment that complies with the applicable legal standard. [Citation.]" (*Adams, supra*, 96 Cal.App.4th at p. 323.) "Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1144.)

## B. *The* Clancy *Decision*

*Clancy* served as the controlling authority at the time the trial court denied defendants' motion to disqualify the Miller Firm. It arose from the City of Corona's efforts to close a bookstore selling sexually explicit materials. Initially, the city passed a zoning ordinance requiring the bookstore to relocate because of its proximity to a church and school. The bookstore owner, however, successfully challenged the ordinance in federal court on constitutional grounds. (*Clancy, supra*, 39 Cal.3d at p. 743.)

"Frustrated by its defeats in federal court," the city adopted a new ordinance defining the bookstore as a public nuisance and hired Attorney James Clancy to prosecute abatement actions under the new ordinance. (*Clancy, supra*, 39 Cal.3d at p. 743.) The city's retainer agreement described Clancy as an independent contractor, and retained him on a contingency fee basis—$60 per hour for all cases in which the city prevailed and obtained an attorney's fee award, but only $30 per hour for all other cases. (*Id.* at p. 745.) Clancy thereafter filed a public nuisance abatement action against the bookstore as the city's " 'special attorney.' " (*Id.* at p. 744.)

The trial court denied the bookstore owner's request to disqualify Clancy as the city's attorney. The bookstore owner sought a writ of mandate, arguing "it [was] improper for an attorney representing the government to have a financial stake in the outcome of an action to abate a public nuisance" because "a government attorney prosecuting such actions must be neutral, as

must an attorney prosecuting a criminal case." (*Clancy, supra*, 39 Cal.3d at p. 745.) The Supreme Court agreed, finding the fee arrangement "inappropriate under the circumstances." (*Id.* at p. 743.) In reaching that conclusion, the court did not rely on "any specific statutory provision or rule governing the conduct of attorneys, but rather upon the courts' general authority 'to disqualify counsel when necessary in the furtherance of justice.' [Citation.]" (*Santa Clara, supra*, 50 Cal.4th at p. 48.) The court disqualified Clancy based on its "find[ing] the contingent fee arrangement prejudice[d] the [bookstore owner]." (*Clancy*, at p. 745.)

The *Clancy* court began its analysis by "review[ing] the responsibilities associated with the prosecution of a criminal case." (*Clancy, supra*, 39 Cal.3d at p. 746.) It found a criminal prosecutor has a "duty of neutrality" because the prosecutor does not represent merely an " ' "ordinary party to a controversy," ' " but rather " ' "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." ' [Citation.]" (*Ibid.*) This duty of neutrality, the court explained, renders "[c]ontingent fee contracts for criminal prosecutors . . . unethical and potentially unconstitutional." (*Id.* at p. 748.)

█ *Clancy* further explained the duty of neutrality is "not limited to criminal prosecutors: 'A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results.' [Citation.] [¶] . . . [¶] When a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated." (*Clancy, supra*, 39 Cal.3d at p. 746.)

Based on these principles, the *Clancy* court declared "there is a class of civil actions that demands the representatives of the government to be absolutely neutral. This requirement precludes the use in such cases of a contingent fee arrangement." (*Clancy, supra*, 39 Cal.3d at p. 748.) *Clancy* concluded attorneys prosecuting public nuisance abatement actions fall into this class and therefore must be "unaffected by personal interests." (*Ibid.*) The court explained: "[T]he abatement of a public nuisance involves a balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes. And when an establishment such as an adult bookstore is the subject of the abatement action, something more is added to the balance: not only does the landowner have a First Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase. Thus, as

with an eminent domain action, the abatement of a public nuisance involves a delicate weighing of values. Any financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated." (*Id.* at p. 749.)

"Public nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions. These actions are brought in the name of the People by the district attorney or city attorney. (Code Civ. Proc., § 731.) [Fn. omitted.] . . . A suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney. [Fn. omitted.]" (*Clancy, supra,* 39 Cal.3d at p. 749.)

The *Clancy* court therefore held "the contingent fee arrangement between the City and Clancy is antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance abatement action. . . . In the interests of justice, therefore, we must order Clancy disqualified from representing the City in the pending abatement action." (*Clancy, supra,* 39 Cal.3d at p. 750.) Although it disqualified Clancy, the Supreme Court noted the city could rehire him if it removed terms giving the lawyer a financial stake in the outcome. (*Id.* at p. 750, fn. 5.)

Significantly, *Clancy* stressed "[n]othing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel. Certainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case. (See, e.g., *Denio v. City of Huntington Beach* (1943) 22 Cal.2d 580 [140 P.2d 392] [contingent fee arrangement whereby the city hired a law firm to represent it in all matters relating to the protection of its oil rights].)" (*Clancy, supra,* 39 Cal.3d at p. 748.)

## C. *The* Santa Clara *Decision*

Three months after the trial court denied defendants' motion to disqualify the Miller Firm, the Supreme Court again considered whether public entities could pay private attorneys a contingency fee to prosecute public nuisance abatement actions. In *Santa Clara*, several counties and cities, represented by both their own government attorneys and private law firms hired under contingency fee agreements, filed a public nuisance abatement action against numerous lead paint manufacturers. (*Santa Clara, supra,* 50 Cal.4th at p. 43.)

Relying on *Clancy*, the manufacturers moved to " 'bar payment of contingent fees to private attorneys.' " (*Santa Clara, supra,* 50 Cal.4th at p. 44.) The trial court granted the motion, finding *Clancy* prohibited public entities

from using contingency fee arrangements in public nuisance actions even when the public entities' government attorneys appear as cocounsel and retain final decisionmaking authority regarding the litigation. The Court of Appeal reversed, holding *Clancy* did not establish a categorical prohibition against contingency fee arrangements and did not bar contingency fee arrangements where government attorneys exercise full control over the litigation. (*Santa Clara,* at pp. 46–47.)

The Supreme Court reversed the appellate court, but in doing so "narrowed" the broad holding of *Clancy*: "[T]o the extent our decision in *Clancy* suggested that public-nuisance prosecutions *always* invoke the same constitutional and institutional interests present in a criminal case, our analysis was unnecessarily broad and failed to take into account the wide spectrum of cases that fall within the public-nuisance rubric." (*Santa Clara, supra,* 50 Cal.4th at pp. 44, 52.) The court also noted, "public-nuisance law over the course of its development has become increasingly more civil in nature than criminal." (*Id.* at p. 52, fn. 8.)

The Supreme Court explained *Clancy*'s unique facts—"a long-running attempt by the City of Corona to shut down a single adult bookstore" and thereby threaten the owner's "vital property rights" in continuing to operate an established, lawful business—prompted the *Clancy* court to import the criminal law's absolute prohibition against contingency fee arrangements. (*Santa Clara, supra,* 50 Cal.4th at pp. 52–53.) Because the public nuisance action in *Clancy* raised constitutional concerns, threatened ongoing business activity, and carried the potential of criminal liability, "the case required the same 'balancing of interests' and 'delicate weighing of values' on the part of the government's attorney prosecuting the case as would be required in a criminal prosecution." (*Santa Clara,* at p. 54.)

■ In *Santa Clara,* however, the Supreme Court found the public nuisance action there "involve[d] a qualitatively different set of interests— interests that are not substantially similar to the fundamental rights at stake in a criminal prosecution." (*Santa Clara, supra,* 50 Cal.4th at p. 54.) Consequently, the *Santa Clara* court reconsidered whether the lawyer's duty of neutrality underlying *Clancy* applied to the public nuisance action before it. The court explained "neutrality is a critical concern in criminal prosecutions because of the important constitutional liberty interests at stake. On the other hand, in ordinary civil cases, we do not require neutrality when the government acts as an ordinary party to a controversy, simply enforcing its own contract and property rights against individuals and entities that allegedly have infringed upon those interests. Indeed, . . . we specifically observed in *Clancy* that the government was not precluded from engaging private counsel on a contingent-fee basis in an ordinary civil case. Thus, for example, public

entities may employ private counsel on such a basis to litigate a tort action involving damage to government property, or to prosecute other actions in which the governmental entity's interests in the litigation are those of an ordinary party, rather than those of the public. [Citation.]" (*Santa Clara,* at pp. 54–55.)

The public nuisance action in *Santa Clara* fell "between these two extremes on the spectrum of neutrality required of a government attorney. The present matter is not an 'ordinary' civil case in that the public entities' attorneys are appearing as representatives of the public and not as counsel for the government acting as an ordinary party in a civil controversy. A public-nuisance-abatement action must be prosecuted by a governmental entity and may not be initiated by a private party unless the nuisance is personally injurious to that private party. [Citations.] There can be no question, therefore, that the present case is being prosecuted on behalf of the public, and that accordingly the concerns we identified in *Clancy* as being inherent in a public prosecution are, indeed, implicated in the case now before us." (*Santa Clara, supra,* 50 Cal.4th at p. 55.)

The court, however, also noted the difference between the nuisance abatement actions in *Clancy* and *Santa Clara,* explaining "[t]his case will not result in an injunction that prevents defendants from continuing their current business operations. The challenged conduct (the production and distribution of lead paint) has been illegal since 1978. Accordingly, whatever the outcome of the litigation, no ongoing business activity will be enjoined. Nor will the case prevent defendants from exercising any First Amendment right or any other liberty interest. Although liability may be based in part on prior commercial speech, the *remedy* will not involve enjoining current or future speech. Finally, because the challenged conduct has long since ceased, the statute of limitations on any criminal prosecution has run and there is neither a threat nor a possibility of criminal liability being imposed upon defendants." (*Santa Clara, supra,* 50 Cal.4th at p. 55, original italics.) The court observed that the potential outcome, which would require the defendants to bear the cost of abating the environmental nuisance, bore the earmarks of a typical civil "remedy one might find in an ordinary civil case . . . ." (*Id.* at p. 56.)

■ Thus, the Supreme Court concluded that the public nuisance action in *Santa Clara* was "closer on the spectrum to an ordinary civil case than it is to a criminal prosecution" because the abatement threatens "neither a liberty interest nor the right of an existing business to continue [its] operation." (*Santa Clara, supra,* 50 Cal.4th at p. 56.) "The role played in the current setting both by the government attorneys and by the private attorneys differs significantly from that played by the private attorney in *Clancy*. Accordingly, the absolute

prohibition on contingent-fee arrangements imported in *Clancy* from the context of criminal proceedings is unwarranted in the circumstances of the present civil public-nuisance action. [Fn. omitted.]" (*Ibid.*)

The *Santa Clara* court nonetheless found the private attorneys before it "subject to a heightened standard of ethical conduct applicable to public officials acting in the name of the public—standards that would not be invoked in an ordinary civil case." (*Santa Clara, supra,* 50 Cal.4th at p. 57.) The Supreme Court imposed this heightened standard because the private attorneys were prosecuting the public nuisance action on the public's behalf. In that capacity, the private attorneys were "entrusted with the unique power of the government and therefore must refrain from abusing that power by failing to act in an evenhanded manner. [Citations.] Indeed, it is a bedrock principle that a government attorney prosecuting a public action on behalf of the government must not be motivated solely by a desire to win a case, but instead owes a duty to the public to ensure that justice will be done. [Citation.]" (*Ibid.*)

■ The Supreme Court next considered whether the contingency fee arrangement in *Santa Clara* compromised this heightened standard of neutrality. (*Santa Clara, supra,* 50 Cal.4th at p. 57.) The court explained the contingency arrangement created a *potential* conflict of interest between the private attorneys' financial stake in the litigation's outcome and their duty to "ensur[e] that a public prosecution is pursued in a manner that serves the public . . . ." (*Id.* at p. 58.) The court, however, concluded that conflict did "not necessarily mandate disqualification in public-nuisance cases when fundamental constitutional rights and the right to continue operation of an existing business are not implicated." (*Ibid.*) It further found "retention of private counsel on a contingent-fee basis is permissible in such cases if neutral, conflict-free government attorneys retain the power to control and supervise the litigation" because "the heightened standard of neutrality is maintained and the integrity of the government's position is safeguarded." (*Ibid.*)

■ To ensure the authority retained by government attorneys is real rather than illusory, the *Santa Clara* court required contingency fee agreements to include specific provisions reserving to the supervising government attorneys key discretionary decisions regarding the litigation. (*Santa Clara, supra,* 50 Cal.4th at p. 63.) The contingency fee agreements must specifically provide that (1) "decisions regarding settlement of the case are reserved exclusively to the discretion of the public entity's own attorneys"; (2) "any defendant that is the subject of such litigation may contact the lead government attorneys directly, without having to confer with contingent-fee counsel"; (3) "the public-entity attorneys will retain complete control over the

course and conduct of the case"; (4) "government attorneys retain a veto power over any decisions made by outside counsel"; and (5) "a government attorney with supervisory authority must be personally involved in overseeing the litigation." (*Id.* at pp. 63–64.) Finally, the *Santa Clara* court emphasized the foregoing provisions "are not exhaustive. The unique circumstances of each prosecution may require a different set of guidelines for effective supervision and control of the case, and public entities may find it useful to specify other discretionary decisions that will remain vested in government attorneys." (*Id.* at p. 64.)

The Supreme Court found the retainer agreements in *Santa Clara* did not contain the requisite provisions and therefore reversed the Court of Appeal's decision. The *Santa Clara* court explained the public entities could retain the private law firms on a contingency fee basis "after revising the respective retention agreements to conform with the requirements set forth in this opinion." (*Santa Clara, supra,* 50 Cal.4th at p. 65.)

D. Clancy *and* Santa Clara's *Contingency Fee Restrictions Do Not Apply to the Water District's Claims*

The issue before us is whether the Water District and the Miller Firm are prosecuting a public nuisance abatement action on the public's behalf. If so, their contingency fee arrangement is subject to the limitations established in *Clancy* and *Santa Clara.* If not, the Miller Firm is free to represent the Water District without regard to the limitations imposed by those cases.

The governmental entities in *Clancy* and *Santa Clara* brought public nuisance abatement actions on the public's behalf. In *Clancy,* the city's lawsuit sought to abate the public nuisance posed by an adult bookstore, but did not assert any other claims and did not seek compensatory damages or allege an injury distinct from that suffered by the public in general. (*Clancy, supra,* 39 Cal.3d at pp. 743–744.)

In *Santa Clara,* the public entities initially brought multiple claims against numerous lead paint manufacturers, including fraud, strict liability, negligence, unfair business practices, and public nuisance. When the manufacturers moved to disqualify the public entities' contingent fee counsel, however, the public entities alleged only a single cause of action for public nuisance seeking abatement as the sole remedy. The public entities did not seek any compensatory damages and they did not allege any injury distinct from the injury to the general public. (*Santa Clara, supra,* 50 Cal.4th at p. 44.) Because the public entities sought abatement only, the Supreme Court found "[t]here [could] be no question . . . the present case is being prosecuted on behalf of the public . . . ." (*Id.* at p. 55.)

Here, unlike *Clancy* and *Santa Clara*, the Water District did *not* bring this action on the public's behalf seeking only an order requiring defendants to abate a public nuisance. Rather, the Water District brought this action in its own name to recover compensatory damages it suffered from the groundwater contamination defendants allegedly caused. The Water District's pleading makes clear that, as the trial court found, this is an action to recover remediation costs. The nominal public nuisance cause of action is only one of six claims and specifically alleged the nuisance "specially and adversely affected" the Water District and caused it injury "separate and distinct from that of the public."

The Water District brought its first cause of action under the uncodified Orange County Water District Act (the Act) to recover all costs it paid, or will pay in the future, to investigate and remediate the groundwater contamination. The Act provides that "the person causing or threatening to cause that contamination or pollution shall be liable to the district to the extent of the reasonable costs actually incurred in cleaning up or containing the contamination or pollution, abating the effects of the contamination or pollution, or taking other remedial action. The amount of those costs, together with court costs and reasonable attorneys' fees, shall be recoverable in a civil action by, and paid to, the district." (Stats. 1989, ch. 802, § 4, p. 2632, West's Ann. Wat.—Appen., *supra*, § 40-8, subd. (c), p. 160; see also Stats. 1933, ch. 924, § 2, p. 2412, West's Ann. Wat.—Appen., *supra*, § 40-2, subd. (9), p. 152 [authorizing the Water District to sue in its own name "to prevent interference with water or water rights used or useful to lands within the district, or diminution of the quantity or pollution or contamination of the water supply of the district"].) This legislation authorizes the Water District to bring a claim on its own behalf to recover all reasonable costs the Water District itself actually incurred.

■ The Water District brought its second cause of action under the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.) to recover all costs it paid, or will pay in the future, to investigate and remediate the contaminated groundwater. Health and Safety Code section 25363 authorizes "[a]ny person who has incurred removal or remedial action costs" to "seek contribution or indemnity from any person who is liable" under the act. (Health & Saf. Code, § 25363, subd. (e).) This code section authorizes the person who actually incurs the remediation costs to bring an action in his or her own name to recover those costs. Under the statute, a public entity also may bring an action if it incurred the requisite removal or remediation costs. (See Health & Saf. Code, § 25319 [defining "person" for purposes of the act].)

In its third cause of action for negligence and fifth cause of action for trespass, the Water District also seeks to recover present and future damages

it suffered from defendants' groundwater contamination. As stated above, even the Water District's fourth cause of action for public nuisance sought compensatory damages based on unique damages the Water District suffered.[3]

Defendants argue the action is prosecuted on the public's behalf because the Water District represents the water users in its service area. According to defendants, the Water District merely exercises sovereign powers to regulate and protect groundwater for its users' benefit and therefore seeks to protect the public's rights by bringing this action. This argument, however, misses the mark.

Although the Water District represents the water users in its service area, and may bring litigation on their behalf (*Orange County Water District v. City of Riverside* (1959) 173 Cal.App.2d 137, 167 [343 P.2d 450]), the Water District did not bring this action in a representative capacity or on its users' behalf. This action does not seek to enforce any rights the Water District's users may have in the groundwater or to recover any damages its users may have suffered from the contamination.

Defendants base their argument on the assumption the Water District can only act in a representative capacity when it is carrying out its duties to manage, regulate, replenish, and protect the groundwater within its service area. Defendants, however, fail to cite any authority to support that assumption. If this assumption were true, all public entities could only act in a representative capacity and could never hire a contingent fee attorney. Both *Clancy* and *Santa Clara*, however, recognize that public entities can bring litigation in their own name to recover damages and hire contingent counsel to prosecute the litigation. (*Clancy, supra,* 39 Cal.3d at p. 748; *Santa Clara, supra,* 50 Cal.4th at p. 55.)

■ The public always benefits when a public entity is able to obtain monetary damages from a defendant that injured the public entity's property or interests. Indeed, any time a public entity recovers damages through litigation the public is benefited because the public entity obtains additional funds to carry out its public purpose. That, however, does not mean the action is brought on the public's behalf under *Clancy* and *Santa Clara*. Defendants fail to explain how the *Clancy* and *Santa Clara* holdings apply to causes of action seeking monetary damages suffered by a public entity.

Defendants also argue the Water District holds only a regulatory interest in the groundwater at issue and therefore lacks the proprietary interest required

---

[3] The Water District also alleges a sixth cause of action for declaratory relief that merely seeks a declaratory judgment regarding the cleanup responsibilities that are the subject of the other causes of action.

to recover monetary damages on its public nuisance cause of action.[4] According to defendants, this inability to recover damages makes this action no different than *Clancy* and *Santa Clara*.

This argument, however, is a red herring. It addresses just one of the Water District's five causes of action seeking monetary damages for its investigation and remediation costs. Defendants make no argument a proprietary interest in the groundwater is required to recover on the Water District's other causes of action. Indeed, regardless whether the Water District's interest in the groundwater is classified as regulatory, proprietary, or usufructuary,[5] the Water District is entitled to recover monetary damages for the investigation and remediation costs it incurred and will incur in the future. As explained above, both the Act and the Health and Safety Code authorize the Water District to bring an action in its own name to recover investigation and remediation costs it incurred without regard to the particular interest the Water District holds in the contaminated groundwater. In the action under the Act, "the necessity for the cleanup, containment, abatement, or remedial work, and the reasonableness of the costs incurred therewith, shall be presumed . . . ." (Stats. 1989, ch. 802, § 4, p. 2632, West's Ann. Wat.—Appen., *supra*, § 40-8, subd. (c), p. 160.) The Water District also seeks these same damages on its negligence and trespass causes of action.

■ We conclude the trial court correctly determined the Water District's lawsuit is essentially an action seeking to recover the costs to investigate and remediate the contaminated groundwater, not a public nuisance abatement action prosecuted on the public's behalf. *Clancy* and *Santa Clara* do not apply to the Water District's lawsuit. Consequently, we need not address the parties' contentions regarding the trial court's alternative ruling that defendants unreasonably delayed bringing the motion to disqualify. We also do not

---

[4] A public entity may bring two different types of public nuisance actions. First, it may bring an action seeking only a judgment requiring the defendant to abate the nuisance. In this type of action, the public entity need not establish it has any sort of property interest damaged by the nuisance, but the only remedy available is abatement; the public entity may not recover monetary damages. In the second type of action, a public entity may obtain both an abatement judgment and monetary damages if it establishes a property interest the nuisance injuriously affected. (Code Civ. Proc., § 731; *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1613, fn. 5 [271 Cal.Rptr. 596], disapproved on other grounds in *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 70 [74 Cal.Rptr.3d 108, 179 P.3d 905].)

[5] " '[T]he right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use.' [Citation.] Hence, the cases do not speak of the ownership of water, but only of the right to its use." (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441 [189 Cal.Rptr. 346, 658 P.2d 709].) "[T]here is no private ownership of groundwater." (*Central and West Basin Water Replenishment Dist. v. Southern Cal. Water Co.* (2003) 109 Cal.App.4th 891, 905 [135 Cal.Rptr.2d 486].)

reach the Water District's motion to dismiss the appeal because they hired independent counsel to supervise the Miller Firm after the Supreme Court decided *Santa Clara*.

## III

### DISPOSITION

The order is affirmed. The Water District shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

On June 23, 2011, the opinion was modified to read as printed above. The petition of appellant Northrop Grumman Systems Corporation for review by the Supreme Court was denied September 14, 2011, S195317. Corrigan, J., did not participate therein.